# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

## CASE NO. 21-cv-1317

BURTON W. WIAND, not individually
but solely in his capacity as Receiver
for OASIS INTERNATIONAL
GROUP, LIMITED, *et al.*,

     Plaintiff,

v.

ATC BROKERS LTD., DAVID
MANOUKIAN, and SPOTEX LLC,

     Defendants.

_____/

## **COMPLAINT**

Burton W. Wiand, not individually but solely in his capacity as the Court-appointed receiver (the "Receiver" or "Plaintiff") over Oasis International Group, Limited ("OIG"), Oasis Management, LLC ("OM"), Satellite Holdings Company ("Satellite Holdings"), and their affiliates and subsidiaries (collectively, the "Receivership Entities," "Receivership," and/or "Receivership Estate"), hereby files this Complaint and sues Defendants ATC Brokers Ltd. ("ATC"), David Manoukian ("Manoukian") and Spotex LLC ("Spotex") (collectively, "Defendants") in this ancillary receivership action.

## The Underlying Civil and Criminal Actions Involving
## the Oasis Entities

### A. The CFTC Action

1.      On April 15, 2019, the Commodity Futures Trade Commission (the "CFTC") sued Michael J. DaCorta ("DaCorta"), Joseph S. Anile, II ("Anile"), Francisco ("Frank") L. Duran ("Duran"), John J. Haas ("Haas") and Raymond P. Montie, III ("Montie") (collectively, the "CFTC Defendants"), as well as three (3) entities they controlled – OIG, OM and Satellite Holdings – in the action styled as *Commodity Futures Trade Commission v. Oasis International Group, Limited, et al.*, DE 7 at p. 14, ¶ 32, Case No. 8:19-cv-00886-VMC-SPF (Apr. 15, 2019 M.D. Fla.) (the "CTFC Action").

2.      In the CFTC Action, the CFTC alleged that the CFTC Defendants had operated OIG, OM, Satellite Holdings, Oasis Global FX, Limited ("OGNZ"), and Oasis Global FX, S.A. ("OGBelize") (collectively, OGNZ and OGBelize are hereinafter referred to as the "Oasis Pools"); in addition, OIG, OM, Satellite Holdings, OGNZ and OGBelize are hereinafter referred to as the "Oasis Entities") as a Ponzi scheme, victimizing the Oasis Entities and hundreds of their innocent investors, who are owed more than $50 million.

### B. The Anile and DaCorta Criminal Prosecutions

3.      The United States of America filed criminal charges against Anile and DaCorta relating to OIG and the Oasis Pools.

2

4.     On August 8, 2019, Anile pleaded guilty to three counts involving the Ponzi scheme: (a) conspiracy to commit wire and mail fraud; (b) engaging in an illegal monetary transaction; and (c) filing a false income tax return.  *See United States of America v. Joseph S. Anile, II,* Case No. 8:19-cr-334-T-35CPT (M.D. Fla.); *see also* Doc. 195, Ex. A (the "Anile Plea Agreement").

5.     Anile admitted in his Plea Agreement:

> From at least as early as November 2011, through and including at least April 18, 2019, in the Middle District of Florida, the defendant, Joseph S. Anile, II, conspired with others to commit wire fraud and mail fraud.  The defendant and coconspirators made false and fraudulent representations to victim-investors and potential investors to persuade them to transmit their funds, via wire and mail, to entities and accounts controlled by conspirators to be traded in the foreign exchange market ("FOREX").  In fact, the defendant and coconspirators used only a portion of the victim-investors' funds for FOREX trading, and the trading resulted in losses which conspirators concealed.  **They used the balance of the victim-investors' funds to make Ponzi-style payments, to perpetuate the scheme**, and for their own personal enrichment….

> In soliciting investments, the defendant and coconspirators made multiple false and fraudulent representations and material omissions in their communications to victim-investors and potential investors.  In particular, they promoted one of the conspirators as an experienced FOREX trader with a record of success but concealed the fact that he had been permanently banned from registering with the CFTC and was prohibited from soliciting U.S. residents to trade in FOREX and from trading FOREX for U.S. residents in any capacity.  They also fraudulently represented that: (a) conspirators did not charge any fees or commissions;

> (b) investors were guaranteed a minimum 12 percent per year return on their investments; (c) conspirators had never had a month when they had lost money on FOREX trades; (d) interest and principal payments made to investors were funded by profitable FOREX trading; (e) conspirators owned other assets sufficient to repay investors' principal investments; and (f) an investment with conspirators was safe and without risk.

*Id.* at 26-28 (emphasis added).

6. Similarly, on December 17, 2019, a federal grand jury returned a two-count indictment against DaCorta (another of OIG's three owners), alleging conspiracy to commit wire and mail fraud as well as engaging in an illegal monetary transaction. *See United States of America v. Michael J. DaCorta,* Case No. 8:19-cr-605-T-02CPT (M.D. Fla.); *see also* Doc. 229, Ex. A.

7. According to the grand jury, as early as November 2011, DaCorta entered into a conspiracy to defraud investors by making numerous fraudulent representations. *See* DCA Doc. 1 ¶ 14b.-d. The Indictment alleged:

> It was a further part of the conspiracy that conspirators would and did use funds "loaned" by victim-investors to: (i) conduct trades, via an offshore broker, in the FOREX market, which trades resulted in catastrophic losses; (ii) **make Ponzi-style payments to victim-investors**; (iii) pay expenses associated with perpetuating the scheme; and (iv) purchase million-dollar residential properties, high-end vehicles, gold, silver, and other liquid assets, to fund a lavish lifestyle for conspirators, their family members and friends, and otherwise for their personal enrichment.

*Id.* at ¶ 14k (emphasis added).

**C. <u>The Appointment of the Receiver by the Court</u>**

8.      On the same day as the commencement of the CFTC Action, April 15, 2019, the Honorable Virginia M. Hernandez Covington appointed the Plaintiff, Burton W. Wiand, as the Receiver for the Receivership Entities.

9.      The Court directed the Receiver, in relevant part, to "[t]ake exclusive custody, control, and possession of the Receivership Estate," which includes "all the funds, properties, premises, accounts, income, now or hereafter due or owing to the Receivership Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Receivership Defendants." *CTFC* Action, DE 7 at 14.

10.     Since the initial appointment, the Court has entered several orders granting the Receiver certain powers, leading ultimately to the Court's Consolidated Order.  CFTC Action, DE 177.  Pursuant to the Consolidated Order and its predecessors, in relevant part, the Receiver has the duty and authority to "investigate the manner in which the financial and business affairs of the Receivership Defendants were conducted . . ." and  pursue actions to recover assets that "were fraudulently transferred by the Defendants and/or Relief Defendants."  CFTC Action, DE 177 at ¶44, 2.

11.     The Court also authorized the Receiver "to sue for and collect, recover, receive and take into possession all Receivership Property"; "bring such legal actions based on law or equity in any state, federal, or foreign court

5

as the Receiver deems necessary or appropriate in discharging his duties as Receiver"; "pursue … all suits, actions, claims, and demands, which may now be pending or which may be brought by … the Receivership Estates"; and "prosecute" actions "of any kind as may in his discretion, and in consultation with the CFTC's counsel, be advisable or proper to recover and/or conserve Receivership Property." *Id.*, ¶¶ 8.B, 8.I; *see also id.*, ¶ 8.J. (authorizing the Receiver to "pursue … all suits, actions, claims, and demands, which may now be pending or which may be brought by … the Receivership Estates").

12.    Plaintiff has brought this action against Defendants in accordance with the Consolidated Order to recover damages caused by Defendants' acts or omissions in connection with Defendants' participation in a $78-million fraudulent scheme involving purported trading in foreign currencies ("forex"); and funds that the CFTC Defendants, the Ponzi scheme operators, caused the Oasis Entities to transfer to ATC.

## Parties and Other Relevant Persons

### A. The Receiver and the Receivership Entities

13.    As stated above, Plaintiff was appointed as Receiver by the Honorable Virginia M. Hernandez Covington on April 15, 2019, and is duly authorized to bring this action.  Plaintiff is a citizen of the State of Florida.

14.    OIG was a Cayman Islands limited corporation formed by Anile, DaCorta and Montie in or around March 2013.  Anile, DaCorta and Montie

6

owned and controlled OIG and served as its Board of Directors. Anile, DaCorta and Montie operated OIG from its offices at 444 Gulf of Mexico Drive, Longboat Key, Florida. OIG acted as a commodity pool operator ("CPO") by soliciting, receiving and accepting funds from pool participants for investments in the Oasis Pools. OIG was not registered with the CFTC in any capacity.

15.    OM was a Wyoming limited liability corporation formed in or around November 2011 with its principal place of business at 318 McMicken Street, Rawlins, Wyoming. Like OIG, OM acted as a CPO by accepting and receiving funds from pool participants for the purpose of investing in the Oasis Pools. OM was not registered with the CFTC in any capacity.

16.    Satellite Holdings was a South Dakota corporation formed in or around October 2014. Satellite Holdings' principal place of business was 110 East Center Street, Suite 2053, Madison, South Dakota. CFTC Defendant Haas was Satellite Holdings' director. Like OIG and OM, Satellite Holdings acted as a CPO by soliciting, receiving and accepting funds from pool participants for investments in the Oasis Pools. Satellite Holdings was not registered with the CFTC in any capacity.

17.    OGNZ was a New Zealand corporation with its principal place of business in Longboat Key, Florida. OGNZ was registered as a financial services provider ("FSP") in New Zealand until it deregistered on June 29, 2015.

7

18.    OGBelize was a Belizean corporation with its principal place of business in Longboat Key, Florida.  OGBelize was registered with the Belizean International Financial Services Commission ("IFSC") from September 2016 until April 2019, at which time the CFTC sued.

## B. Defendants

19.    Defendant ATC is a corporation formed under the laws of England and Wales on April 18, 2012.  However, ATC's principal place of business is in La Cañada, California, as the location given by ATC for Manoukian's residence in the Confirmation Statement filed with the Companies House (which incorporates companies in the United Kingdom and registers company information and makes it available to the public) on April 20, 2017, which identified Manoukian as a Person with Significant Control ("PSC") for ATC. ATC is registered with the Financial Conduct Authority ("FCA") in the United Kingdom and authorized to conduct certain business involving forex trading.

20.    Defendant Manoukian is an individual who is a citizen of the State of California residing in La Cañada, California.  Manoukian is, and was, ATC's controlling principal, controlling executive, controlling director, and primary shareholder.  Manoukian is also an owner of Defendant Spotex.  As stated above, ATC has identified Manoukian as a PSC with the Companies House. Through his affiliation and positions with ATC, Manoukian is registered with the FCA.  Through his affiliation and positions as an associate and principal

with ATC Brokers (identified below), he is registered with the National Futures Association ("NFA").

21.    Manoukian personally managed almost all aspects of the ATC-Oasis Entities' relationship from the outset through the commencement of the CFTC Action and did so from his office in California.  Manoukian dealt directly with the Oasis principals, including Anile and DaCorta.

22.    As an example, when Anile was submitting account opening application materials to Manoukian for OGBelize on January 4, 2017, Manoukian emailed Anile requesting that he call him at a phone number with an 818 area code that matches the office line for ATC's U.S. affiliate (ATC Brokers).  Further, Manoukian dealt directly with Anile and DaCorta during their residency in the Middle District of Florida, according to emails.  Manoukian also regularly emailed Anile and DaCorta from the email server of ATC's U.S. affiliate.

23.    Defendant Spotex is a Delaware limited liability company with an office in New Jersey.  Upon information and belief, none of Spotex's members are citizens of Plaintiff's residence of Florida.  In late 2017 through 2018, the Oasis Entities contemplated acquiring Spotex to have an electronic communications network of its own.  Spotex, through Manoukian, delivered due diligence documents to the Oasis Entities, and Manoukian was the prime negotiator on behalf of Spotex.

24.    Non-party ATC Brokers, f/k/a Avail Trading Corp., is a California corporation formed on August 3, 2005, with its principal place of business in Glendale, California.  ATC Brokers is an NFA member.

25.    ATC Brokers and ATC were managed by Manoukian and were under the common ownership of Manoukian and his brother.

### Subject Matter Jurisdiction

26.    The Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. § 78aa, 28 U.S.C. § 754, and principles of ancillary or supplemental jurisdiction under 28 U.S.C. § 1367 because:

> a.  the Receiver sues to accomplish the ends sought in the CFTC Action (*i.e.*, the marshaling of assets derived from victimized investors), wherein his appointment was made and such an action is ancillary[1];
>
> b.  the Receiver files this ancillary action in the same District wherein the Receiver was appointed and wherein the Court has exclusive jurisdiction over the Receivership Estate;
>
> c.  the Receiver is obligated by the Consolidated Order entered in the CFTC Action to take custody, control, and possession of the Receivership Entities' assets by investigating and instituting actions against individuals or entities that improperly received funds

---

[1]  If an action is filed by the Receiver in the district in which the Receiver had been appointed, no independent jurisdictional grounds need be shown.  *Baker v. Heller*, 571 F. Supp. 419 (S.D. Fla. 1983).  "When an action is commenced by a receiver . . . to accomplish the ends sought and directed by the suit in which the appointment was made, such action or suit is regarded as ancillary . . . and . . . jurisdiction of these subordinate actions or suits is to be attributed to the jurisdiction upon which the main suit rested."  *Pope v. Louisville, New Albany & Chicago Ry. Co.*, 173 U.S. 573 (1899).

transferred to and from the Receivership Entities and/or damaged the Receivership Entities;

d. the Receiver's subject claims seek to recover such damages, pursuant to the Consolidated Order entered in the CFTC Action;

e. the subject claims are so related to the claims involved in the CFTC Action that they form part of the same case or controversy under Article III of the United States Constitution; and

f. the Court reappointed the Receiver as such on April 23, 2021, and the Receiver filed his required notice in the Federal District Court where ATC and Manoukian reside, the District Court of the Central District of California, on April 28, 2021, or within ten (10) days as prescribed by 28 U.S.C. § 754.

27.     Alternatively, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).  As set forth above, there is complete diversity between the parties, and more than $75,000 is at issue in this action, exclusive of fees, costs and interest.

## **Venue**

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 754 and 1692 because this Complaint has been brought to accomplish the objectives of the Consolidated Order and is, thus, ancillary to the Court's exclusive jurisdiction over the Receivership Estate.

29.     Venue is also proper in this District because (a) the Receiver resides in this District; (b) the liquidation of the defunct forex trading pools and their related entities comprising the Receivership Entities is occurring

11

through the Receiver in the CFTC Action in this District; (c) the agency relationship and subsequent business venture specifically giving rise to the Receiver's claims were created and continuously operated in and out of this District; and (d) the CFTC Action, to which this suit is ancillary, is pending in this District, as well as the below-mentioned criminal prosecutions against Anile and DaCorta.

## **Personal Jurisdiction**

30.    Pursuant to 28 U.S.C. §§ 754 and 1692, Defendants are subject to personal jurisdiction before this Court.  Pursuant to 28 U.S.C. § 754, the Receiver has filed the Consolidated Order in the United States District Court for the Central District of California, where both ATC and Manoukian operate.

31.    Additionally, Defendants are subject to personal jurisdiction in this Court because the claims presented in this Complaint arise from Defendants' dealings with the CFTC Defendants in this District.

32.    ATC was the exchange firm for the doomed forex trading underlying the Oasis Ponzi scheme and ultimately for more than $21 million of investor-derived investments in two commodity pools for OGNZ ("Oasis Pool 1") and OGBelize ("Oasis Pool 2") (again, the "Oasis Pools"), which operated out of Florida.

33.    Manoukian handled the ATC-Oasis relationship and personally conducted the commissions and/or omissions alleged herein, including

12

conducting business with the CFTC Defendants in Florida.

34.     Spotex created the software that DaCorta used to conduct the doomed forex trading, meaning Spotex provided the electronic trading platform that was necessary to carry out the Ponzi scheme.  Spotex maintained back-door accounts for OIG and the Oasis Pools through www.spotex.com.

35.     In addition to the Consolidated Order, this Court has personal jurisdiction over Defendants pursuant to Florida Statute § 48.193(1)(a)(1) because Defendants received compensation and ATC/Manoukian corresponded on numerous occasions with CFTC Defendants Anile and DaCorta in Florida.

36.     Furthermore, this Court has personal jurisdiction over Defendants pursuant to Florida Statute § 48.193(1)(a)(2) because Defendants committed tortious acts which touched, concerned, and affected the operations of OIG and the other Receivership Entities in Florida.

37.     Because OIG's and the other Receivership Entities' operations occurred in Florida, OIG, the Oasis Pools and the other Receivership Entities were damaged in Florida under Florida Statute § 48.193(1)(a)(2).

38.     ATC/Manoukian also communicated with Anile and DaCorta, individually and on behalf of the Receivership Entities, in writing and verbally on countless occasions, so the communications were sent to and from Florida and, therefore, occurred in Florida under Florida Statute § 48.193(1)(a)(2).

39.     There are significant contacts with Florida.  OIG and the Oasis

Pools had offices in Florida. CFTC Defendants Anile and DaCorta resided in Florida. Other CFTC Defendants such as Duran also resided in Florida. OIG and the Oasis Pools operated in Florida. Anile and DaCorta operated the majority of the CFTC Relief Defendants[2] in Florida. Countless, ongoing, and frequent communications with ATC/Manoukian occurred in Florida, including Anile's instructions and opening of the subject ATC accounts and DaCorta's trading of the accounts further described below. Defendants provided services to the Oasis Pools in Florida. The CFTC investigated in Florida. The CFTC filed the CFTC Action in Florida. The United States criminally investigated among others CFTC Defendants Anile and DaCorta in Florida. The United States filed the criminal actions against CFTC Defendants Anile and DaCorta in Florida. Injury to the Receivership Entities and the conduct causing such injury occurred in Florida. The Receiver, who is responsible for righting all of the injuries to the Receivership Entities (including the Oasis Pools), resides in Florida and was appointed in Florida. This action arises in substantial part from these non-exhaustive Florida-based items. Therefore, Florida has the most significant relationship to this action.

---

[2]   These entities refer to Bowling Green Capital Management LLC; Lagoon Investments, Inc.; Roar of the Lion Fitness, LLC; 444 Gulf of Mexico Drive, LLC; 4064 Founders Club Drive, LLC; 6922 Lacantera Circle, LLC; 13318 Lost Key Place, LLC; and 4Oaks LLC (collectively, the "CFTC Relief Defendants").

## The Oasis Ponzi Scheme

### A. The Oasis Entities Raised $78 Million from Investors

40.    From late 2013 to the Receiver's appointment in April 2019, the CFTC Defendants fraudulently solicited more than 700 investors, the majority of whom were U.S. residents, to invest more than $78 million in OIG, OM, and Satellite Holdings for purposes of investing in pooled investments in retail forex in the two subject Oasis forex commodity pools – Oasis Pools 1 and 2.  In reality, the CFTC Defendants operated the Oasis Entities as a Ponzi scheme with OIG as the principal entity used to perpetrate the Ponzi scheme.

41.    As part and parcel of the Ponzi scheme, the CFTC Defendants caused OIG, OM, and Satellite Holdings to (a) share the same office and employees; (b) commingle their funds; and (c) operate under the common "Oasis" trade name.

42.    The CFTC Defendants caused the Oasis Entities to operate as one common enterprise through their own interrelated entities.  The Oasis Entities maintained one common website at the Oasis website www.oasisinternationalgroupltd.com.    According to this website, Oasis "provides an array of asset management and advisory services, including corporate finance and investment banking . . . investment sales/trading and clearing services . . . financial product development, and alternative investment products."

15

43.    Over time, the CFTC Defendants raised funds from innocent investors through several forms of securities.  For example, when OIG was formed, a portion of its common shares (less than 10% in total) was owned by at least six (6) innocent and honest shareholders, meaning they were not aware of the CFTC Defendants' misconduct.  As such, any misconduct on the part of the individual CFTC Defendants should not be imputed to OIG and the other Oasis Entities.   These six shareholders' common shares were ultimately redeemed over time for cash.

44.    The CFTC Defendants also began an offering to third party shareholders of a minimum of 100,000 and a maximum of 500,000 non-voting OIG preferred shares at $10 per share.  These investments were memorialized in a Confidential Private Placement Memorandum ("PPM").

45.    The PPM promised these shareholders/investors a guaranteed minimum annual return or dividend of 12% from trading forex.  All preferred shareholders/investors regularly received quarterly preferred interest payments.

46.    There were more than sixty (60) preferred shareholders from 2013-2017 whose preferred shares were ultimately redeemed during this period for cash.  Nearly all of the preferred stock shareholders were innocent and honest, meaning they were unaware of the CFTC Defendants' misconduct.  As such, any misconduct on the part of the individual CFTC Defendants should not be

16

imputed to OIG and the other Oasis Entities. The shareholders' preferred shares were ultimately redeemed several years later through 2017 for cash and/or promissory notes.[3]

47.    After selling shares by means of the PPM, the CFTC Defendants continued offering OIG investments to third party investors through a Promissory Note and Loan Agreement. These investors were also completely innocent. As such, any misconduct on the part of the individual CFTC Defendants should not be imputed to OIG and the other Oasis Entities.

## B. The Oasis Entities and Their Principals Were Unregistered in Violation of the Commodity Exchange Act

48.    As indicated above, the Oasis Entities' supposed purpose for raising funds from innocent investor-victims, the majority of whom resided in the U.S., was to pool investor funds to trade forex contracts using leverage from a liquidity provider, which turned out to be Defendant ATC. As discussed below, the Oasis Entities' activities required registration with the CFTC.

49.    From at least March 2015 through April 15, 2019, the CFTC Defendants caused OIG, OM and Satellite Holdings to act as CPOs of the Oasis

---

[3] Like OIG, OM also had its own shareholders in the form of many limited partners that signed OM limited partnership agreements. Their shareholder/limited partnership interests were also redeemed for cash over time. Like the innocent and honest OIG shareholders, the OM shareholders/limited partners were also innocent and honest, meaning they were not aware of the CFTC Defendants' misconduct; therefore, the misconduct of the individual CFTC Defendants should not be imputed to OM and the other Oasis Entities.

Pools because they were entities engaging in a business that is of the nature of a commodity pool and, in connection with that business, solicited and/or accepted pool funds for a pooled investment vehicle that is not an Eligible Contract Participant ("ECP") and that engages in transactions described in Section 2(c)(2)(C) of the Commodity Exchange Act, 7 U.S.C. § 2(c)(2)(C) (2012), other than on or subject to the rules of a designated contract market ("retail forex transactions").

50.     OIG, OM and Satellite Holdings were not statutorily exempt or excluded from registration as CPOs.  However, the CFTC Defendants failed to register OIG, OM or Satellite Holdings as CPOs with the CFTC.

51.     Similarly, Anile and DaCorta, among others, acted as unregistered CPOs because they operated the Oasis Pools as pooled investment vehicles that were not ECPs, as provided by Section 2(c)(2)(C)(iii)(I)(cc) of the Commodity Exchange Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) (2012).

52.     Anile and DaCorta also acted as associated persons ("APs"), as defined by 17 C.F.R. § 5.1(d)(2), of CPOs OIG, OM and Satellite Holdings. However, Anile and DaCorta failed to register as APs with the CFTC.

## C. The CFTC Defendants Misrepresented the Oasis Investments and Omitted to Disclose Material Information

53.     The Oasis Entities' and their principals' failure to register was not merely a technical violation.  Registration brings with it the requirement to

submit periodic reports to regulators to ensure sufficient oversight and to ultimately prevent the use of fraudulent and deceptive practices against innocent investors.

54.     For example, regarding the Promissory Note and Loan Agreement, the CFTC Defendants provided investors a document called the "Agreement and Risk Disclosures."  The latter generally stated that an investment in forex entailed investment risk.   However, these documents failed to disclose adequately how the risks from forex investing could effectively eliminate the 12% guaranteed annual return to investors that was promised in the Promissory Note and Loan Agreement or impair the investors' principal investments in the notes themselves.

55.     The CFTC Defendants made other material misrepresentations to investors, including that:

      a.  all investor funds would be traded in forex;

      b.  investors would receive a minimum guaranteed annual return of 12%;

      c.  the Oasis Pools were always profitable, had made returns of approximately 22% in 2017 and approximately 21% in 2018;

      d.  the Oasis Pools never lost money; returns were from profitable trading;

      e.  the Oasis Pools were "no risk" investments;

      f.  investors would receive additional returns by referring other investors; and

g. investments were secured by $15-$16 million in real estate owned by OIG.

56. These representations were patently false, including that:

a. tens of millions of dollars raised were Ponzi-like payments and unauthorized personal and business expenses;

b. investor returns were completely fraudulent, Ponzi-like payments of new investor money repaying older investors;

c. the Oasis Pools were never profitable and had large negative returns in 2017 and 2018;

d. the Oasis Pools always lost money, including more than $60 million in total trading losses from numerous margin calls;

e. returns were not from profitable trading, but were, again, Ponzi-like payments of new investor money repaying older investors;

f. the Oasis Pools were high risk investments that had a leverage ratio of 100:1 and led to the issuance of numerous margin calls;

g. investors' referral fees were, again, Ponzi-like payments of new investor money paying older investors; and

h. investments were not secured by $15-$16 million in real estate owned by OIG.

57. The CFTC Defendants also omitted to disclose material information to investors, including that:

a. DaCorta, the CEO of OIG and the head trader of the Oasis Pools, was permanently barred from registering with the CFTC as of 2010 and was, therefore, barred from soliciting and trading forex for investors; and

20

b.  DaCorta had filed for Chapter 7 personal bankruptcy protection.

58.    The CFTC Defendants were supposed to trade all investor-derived funds in forex for the benefit of investors.  Instead, the CFTC Defendants traded only a small fraction of the funds, specifically transferring $21,925,000 to forex trading accounts at ATC out of over $75 million raised.  However, the CFTC Defendants lost every penny traded at ATC in poor forex trading, and the only funds remaining – approximately $2 million in cash – had not been deployed trading.

59.    Despite repeated mounting losses, the CFTC Defendants continued depositing investor funds at ATC with the Oasis Pools.

60.    Regarding the Oasis Pools' trading accounts at ATC, the CFTC Defendants traded forex on a margined or leveraged basis that did not result in timely delivery and otherwise did not create an enforceable obligation of delivery between buyer and seller.  Trades were leveraged 100:1, meaning trading could be done at 100 times the amount of cash in the Oasis Pools' trading accounts.

61.    The CFTC Defendants misappropriated (a) more than $28 million to make fictious redemption or return payments to investors in furtherance of the Ponzi scheme and (b) more than $10 million to pay themselves, their insiders, their employees or agents.  These misappropriations were all

unauthorized personal and business transactions.

62.     As alleged herein, without Defendants' substantial assistance, the CFTC Defendants could not have perpetrated their Ponzi scheme.

### Defendants' Knowledge and Actions in Assisting the Oasis Ponzi Scheme

### A. ATC and Manoukian Ignored Glaring Red Flags When Opening Accounts for the Oasis Entities

63.     The lack of registration by the persons operating the Oasis Pools was an obvious red flag that ATC and Manoukian intentionally overlooked in order to secure their business.

64.     The Oasis Entities could not engage in any forex transactions without a forex firm that would open forex accounts for them and provide them with liquidity to trade on leverage.  ATC was a firm that provided these services, and Manoukian supervised and ultimately approved the ATC account applications for opening the subject ATC accounts for such services. Manoukian was also the primary ATC representative that handled the Oasis relationship from its inception in 2015 through its end in April 2019, including dealing directly with the Oasis principals, such as Anile and DaCorta.

65.     In addition, the Oasis Entities could not engage in any forex transactions without a "white label" software suite that would support the Oasis Entities and generate online account records with various back-office tasks.  Spotex, through their affiliation with ATC, was a firm that provided the

technology for these services to ATC clients such as Anile, DaCorta and other Oasis representatives.

66.    The Oasis Entities' choice of ATC was not coincidental.  DaCorta introduced the Oasis Entities to ATC through Michael Mirarchi ("Mirarchi"), DaCorta's former business acquaintance.  From April to July 2015, Mirarchi was ATC's Chief Executive Officer.  Upon information and belief, before agreeing to surrender his NFA license permanently to avoid charges in 2010, DaCorta had conducted business with Mirarchi while the latter worked for Citigroup Global Markets, Inc.

67.    Before opening an account for any of the Oasis Entities, ATC required each Oasis Pool to complete an application and to submit additional paperwork to establish, among other things, proof of residence.  This "onboarding" procedure allowed ATC to conduct due diligence reviews on the Oasis Entities, Oasis Pool-applicant and its principals/managers to comply with, among other things, ATC's anti-money laundering ("AML") and Know Your Customer ("KYC") procedures required by applicable laws and regulations, including ensuring that the Oasis Entities, Oasis Pool-applicant its principals/managers, as appropriate, were properly registered – not only with the jurisdiction where they were formed, but also in the jurisdiction where the principals/managers of the Oasis Entities and the Oasis Pools' clients resided.

68.    Nevertheless, ATC and Manoukian only checked to see if the Oasis Pools-applicants were registered under *any* jurisdiction, instead of ensuring that the Oasis Pools were registered in the jurisdiction where they were operating and where their clients resided: The United States.

69.    Moreover, ATC and Manoukian knew or should have known that the Oasis Pools were being operated by OIG through the management of DaCorta and Anile who resided in the U.S.  ATC and Manoukian knew or should have known that OIG was an unregistered CPO.

70.    As indicated above, during the time that ATC engaged in business with the Oasis Entities, Manoukian was a CFTC-registered principal and associated person of ATC Brokers (U.S.) and an NFA Associate Member (as was Manoukian's brother, Jack Manoukian, who was co-owner of ATC and ATC Brokers (U.S.)).

71.    Manoukian and his brother are, and were, aware and knowledgeable of CFTC registration requirements and NFA Rules, including Anti-Money Laundering ("AML") and Know Your Client ("KYC") policies.  At the very least, the Manoukians should have known of CFTC registration requirements and NFA Rules.

72.    The Manoukians were at all times required and expected by the CFTC and NFA to adhere to CFTC registration requirements and NFA Rules in their capacities as principals of ATC Brokers (U.S.).  In short, Manoukian

24

and his brother could not claim ignorance of CFTC Regulations and NFA Rules while being registered in the U.S., even though they might have been engaged in business with the Oasis Entities through ATC.

- **ATC and Manoukian Knew or Should Have Known That the Oasis Pools Were Operating in the United States and Subject to Registration in the United States**

73.     The Oasis Entities never concealed their location (*i.e.*, where they truly were operating), and, in any event, ATC and Manoukian knew or should have known that the Oasis Entities were operating in the U.S. and, accordingly, should have been registered with the CFTC.  For example:

    a. All communications by ATC and Manoukian were made to Anile, DaCorta and Joseph Paniagua ("Paniagua") (the Oasis compliance representative) while they were in the U.S.;

    b. DaCorta's and Paniagua's email signature blocks included phone numbers with area codes in New York state; and

    c. Anile told Manoukian that Anile split his residency between New York and Florida.

74.     Moreover, when completing the application for Oasis Global FX, Limited (again, "OGNZ"), Anile tried to input "United States" as his country of residence on the application form, but the dropdown on the form had no entry for "United States."  Anile told Mirarchi about this issue, but Mirarchi directed him to simply input "United Kingdom."  ATC and Manoukian knew or should

have known this was false.  In particular, Anile had provided utility bills to ATC showing that his residence was in New York and Florida.

75.    ATC and Manoukian also knew or should have known from the application for Oasis Global FX, S.A. (again, "OGBelize"), dated December 28, 2016, that the Oasis Pools were operating from the U.S.  Anile expressly represented that DaCorta, its "Key Manager" and Chief Investment Officer, was located in Longboat Key, Florida, not Belize.

76.    Based on the foregoing information, ATC and Manoukian knew or should have known that the Oasis Entities were operating pooled investments in the U.S. without registration and, therefore, illegally.

- **ATC and Manoukian Knew or Should Have Known That the Oasis Pools' Funds Were from the U.S. for U.S. Investors**

77.    In addition to ATC and Manoukian knowing the Oasis Entities were operating in the U.S., ATC and Manoukian also knew or should have known that the funds for the Oasis Pools came from U.S. investors through U.S. banks.

78.    For example, when asked in the ATC account applications from where the third-party funds would come, DaCorta represented to ATC that the third-party funds were from "friends and family" in the U.S.  However, there were hundreds of "friends and family," whose funds were deposited.

79.     On the ATC account applications, Anile represented that the Oasis Pools would be investing third-party funds.   Specifically, from November 2016 to April 2019, all deposits accepted by ATC for the Oasis Pools, totaling almost $22 million, came from deposits transferred from banks in the U.S.

- **The Oasis Entities Violated the Registration Provisions of the Commodity Exchange Act**

80.     Due to these connections with the U.S., OIG and the Oasis Pools (as well as the persons associated with them, including Anile and DaCorta) should have been registered with the CFTC to act as CPOs, but failed to register in violation of the Commodity Exchange Act, 7 U.S.C. § 6m(1) (2012).

81.     Despite knowing that the Oasis Pools were operating in the U.S. and should have been registered with the CFTC, ATC and Manoukian continued accepting business from the Oasis Pools, including ATC executing trades for forex transactions that resulted in a total loss of all funds traded from the nearly $22 million in deposits that ATC accepted for the Oasis Pools.[4]

- **The Use of a Single Omnibus Account Was a Red Flag**

82.     In the respective OGNZ and OGBelize account applications, Anile disclosed to ATC and Manoukian that OGNZ and OGBelize would be funded

---

[4] At the time of the asset freeze in the CFTC Action, approximately $2 million in cash remained in the Oasis Pool 2 account at ATC which had not been deployed for trading. As discussed below, these funds are in the process of being repatriated from the United Kingdom for the benefit of the Receivership Estate.

with proprietary and third-party funds.  However, ATC only opened one account for OGNZ and only one for OGBelize where the proprietary and third-party funds were commingled.

83.     Because of this commingling of funds, ATC and Manoukian should have recognized that OGNZ and OGBelize were, respectively, a pooled investment and should have conducted due diligence regarding its CPO, OIG, to ensure that OIG was properly registered to conduct business as a CPO.

- **ATC and Manoukian Ignored Additional Red Flags to Conduct Business with the Oasis Pools**

84.     Notwithstanding the fact that ATC and Manoukian knew or should have known that the Oasis Entities were acting as unregistered CPOs in violation of the Commodity Exchange Act, ATC and Manoukian intentionally ignored additional red flags to ensure that they would continue receiving the hefty commissions paid by the Oasis Pools for trades they otherwise should not have been transacting.  Some of those red flags include the following numerous undisputed facts:

       a. Oasis (NZ) ceased operations and deregistered from New Zealand within 2 weeks after ATC opened its account, but ATC and Manoukian never inquired as to why;

       b. After Oasis (NZ) deregistered as a Financial Services Provider, ATC and Manoukian continued conducting business with it;

c. Anile represented that he was a citizen of the United Kingdom on the Corporate Application for Oasis (Nevis), when his citizenship for the Oasis (NZ) application was the United States.  No one from ATC inquired any further about the discrepancy;

d. Even though Oasis (Nevis) was never approved by ATC, ATC nonetheless accepted deposits from Oasis (Nevis) in November and December 2016, transferred from a U.S. bank account;

e. The bank statement page submitted on January 4, 2017, as part of Oasis (Belize)'s application redacted the accountholder's name and account balances, while the only activity in the account for December 2016 was for service fees.  ATC and Manoukian never demanded an unredacted statement;

f. The Oasis (Belize) application represented that the company had one office, which was its principal place of business in Belize, which was false because DaCorta, the Chief Investment Officer, was identified as residing in Longboat Key, Florida; and

g. On January 5, 2017, after ATC required a utility bill for Oasis (Belize), Anile sent an invoice from TollFreeForwarding.com which was purchased four (4) days earlier.  The bill, however, never reflected any Belizian telephone number.  Rather, it reflected that Anile had any calls made to the Cayman Islands forwarded to Sarasota, Florida.

## B. ATC Accepted Deposits for the Oasis Pools

85.  ATC and Manoukian ignored these red flags in order to conduct business with the Oasis Entities, including accepting almost $22 million in deposits from U.S. banks for the Oasis Pools.

86.  The ATC account in the name of Oasis Global FX, Limited,

(again, OGNZ or Oasis Pool 1) was opened in or around mid-2015 and received $1.3 million of investor-derived funds through December 2016. Attached as Exhibit A is a list of the itemized transfers by date, amount, sender, and sender's account. All of the funds transferred to this ATC account were lost trading forex, specifically net losses of approximately $1,654,000.

87.    The OGNZ account at ATC was essentially a financial black hole. Even though third-party funds poured into ATC, no disbursements, transfers, or returns were ever made to the Oasis Entities from this account— or to anyone other than to ATC for its commissions and fees. Nevertheless, ATC never questioned anyone at OIG as to why no funds had been disbursed or withdrawn, other than for ATC's commissions.

88.    Anile and DaCorta were the sole signatories on this account, DaCorta was listed as the President of OGNZ, and DaCorta was the sole authorized trader for this account.

89.    As stated above, OGNZ deregistered on June 29, 2015. Nevertheless, the account for OGNZ remained open until it was finally closed on February 7, 2017.

90.    The ATC account in the name of Oasis Global FX, S.A. (again, OGBelize or Oasis Pool 2) received $20,625,000 of investor-derived funds from January 2017 through April 2019. Attached as part of Exhibit A is a list of the itemized transfers in this ATC account by date, amount, sender, and sender's

account.  The funds transferred to and traded in this ATC account were also lost trading forex, specifically losses of approximately $60 million.  Trading returns in 2017 were -45% and in 2018 were -96%.

91.     The OGBelize account at ATC was, again, essentially a financial black hole.  Even though millions of dollars third-party funds poured into ATC, no disbursements, transfers, or returns were ever made to the Oasis Entities from this account—or to anyone other than to ATC for its commissions and fees.  Nevertheless, ATC never questioned anyone at OIG as to why no funds had been disbursed or withdrawn, other than for ATC's commissions.

92.     Anile was the sole signatory on this account, and DaCorta was, once again, the authorized trader for this account.

93.     This account remained open until the CFTC sued and froze the remaining $2,005,368.28, which are in the process of being repatriated for the benefit of the Receivership Estate.

### The Fraud in Presenting the Oasis Pools' Fictional Returns

94.     ATC, Manoukian, and Defendant Spotex also played a key role in the presentation of fraudulent website data to Oasis investors.

95.     Spotex provided a "white label" software suite that would support ATC's clients and generate online account records with various back-office tasks for such clients.  Spotex, through their affiliation with ATC, was a firm that provided the technology for these services to ATC's clients, such as Anile,

DaCorta and other Oasis representatives.

96.    As a result, ATC and Spotex provided the following: (a) technological and operational support services to the CFTC Defendants relating to the accounts, including with server space, software, and access to ATC's trading platform, including the MT4 trading platform; (b) providing the CFTC Defendants with various back-end/back-office reports that would and did manipulate via back-end/back-office "adjustments" trading losses into fictitious trading profits and would populate the fictitious profits (and remove the losses) to the online portal viewable by investors; and (c) branding "white label" software with the Oasis logo.

97.    The software and website provided online account records for OIG investors regarding purported balances, purported trades, purported trading volume, and purported "spread pay" to be distributed as income among investors.  These account records were presented to investors via a website that encouraged investors to place and keep their money with the Oasis Entities, with the hopes of continued income.

98.    The representations to investors concerning the investment income they purportedly received were false, however, as confirmed by the criminal plea agreement of Oasis co-founder and former President, Anile. As stated above, Oasis co-founder and Chief Investment Officer, DaCorta, is presently under federal indictment.

99.    Regarding the investor portal, Defendants created master, back-office, and "test" accounts for this web portal.  This information was central to Oasis's method of attracting and keeping investors' funds, by presenting the illusion of continuous investment earnings.   Sample screen reports are reproduced here, showing accounts and earnings for individual investors:

| | |
|---|---|
| 16055195 | Oasis Global (Nevis), Limited 010MCh |
| 16055196 | Oasis Global (Nevis), Limited 011DrJA |
| 16055197 | Oasis Global (Nevis), Limited 012LSp |
| 16055198 | Oasis Global (Nevis), Limited 013ChDv |
| 16055199 | Oasis Global (Nevis), Limited 015KK |
| 16055200 | Oasis Global (Nevis), Limited 016NHCV |
| 16055201 | Oasis Global (Nevis), Limited 017JS |
| 16055202 | Oasis Global (Nevis), Limited 018RMlll |
| 16055203 | Oasis Global (Nevis), Limited 019DrHR |
| 16055205 | Oasis Global (Nevis), Limited 021MSq |
| 16055206 | Oasis Global (Nevis), Limited 022KPJS |

| | | | | | |
|---|---|---|---|---|---|
| May 04, 2017 05:59 PM | May 04, 2017 05:59 PM | OB60055 | USD | Active | 450,396.88 |
| May 15, 2017 01:03 PM | May 15, 2017 01:03 PM | OB60055 | USD | Active | 143,446.56 |
| May 30, 2017 03:33 PM | May 30, 2017 03:33 PM | OB60055 | USD | Active | 697,475.68 |
| May 30, 2017 04:29 PM | May 30, 2017 04:29 PM | OB60055 | USD | Active | 168,373.95 |
| Jun 07, 2017 03:13 PM | Jun 07, 2017 03:13 PM | OB60055 | USD | Active | 174,527.15 |
| Jun 08, 2017 11:09 AM | Jun 08, 2017 11:09 AM | OB60055 | USD | Active | 1,228,988.33 |
| Jun 08, 2017 03:42 PM | Jun 08, 2017 03:42 PM | OB60055 | USD | Active | 4,060,664.08 |
| Jun 08, 2017 04:09 PM | Jun 08, 2017 04:09 PM | OB60055 | USD | Active | 1,672,271.10 |
| Jun 08, 2017 04:31 PM | Jun 08, 2017 04:31 PM | OB60055 | USD | Active | 382,719.36 |
| Jun 12, 2017 08:12 PM | Jun 12, 2017 08:12 PM | OB60055 | USD | Active | 454,178.30 |
| Jun 15, 2017 03:48 PM | Jun 15, 2017 03:48 PM | OB60055 | USD | Active | 91,238.92 |

100.  Defendants actually knew that (a) the investor online portal showed purported profitable trading for the benefit of the Oasis investors; (b) the purported profits were completely false and fictitious (again, the forex trading at ATC suffered losses on a daily, weekly, monthly, and yearly basis

33

and ultimately totaled catastrophic losses beyond the $21,925,000 transferred to ATC); and (c) the total amount of actual, exorbitant liabilities owed to investors.

101. Regarding the issue of liabilities, shortly before the CFTC unsealed its enforcement action, Oasis requested that Manoukian provide a certification on ATC's letterhead for OGBelize's auditors that OGBelize had a balance of $3,142,404.42 with ATC at the end of calendar year 2018. Three (3) days later, Manoukian dutifully followed Oasis's instructions to provide the certification, even though it was blatantly false and misleading. In fact, upon information and belief, the account held less than $1.5 million at the end of 2018, based on information in ATC records that were immediately available to Manoukian. These specific facts were not known or approved by investors. These specific facts are also evidence of a crystal-clear Ponzi scheme.

102. In addition, Defendants actively assisted, participated, supervised, and ensured automating or programming the necessary "adjustments" on the back-end of the investor online portal to allow the CFTC Defendants to carry out the ruse of false investor account records. Investors could not view these "adjustments" on the back-end of the portal, but Defendants could and actually assisted, participated, supervised, and ensured the "adjustments" would be automated in an easier, quicker and more efficient manner for the benefit of the CFTC Defendants.

34

103. The "adjustments" hid the trading losses from investors and populated fictitious or false profits to investors.  It was necessary to automate the adjustments from manual inputs, as the number of investors grew and the CFTC Defendants raised more money from investors and transferred more money to ATC.  These specific facts were not known or approved by investors. These specific facts are also evidence of a crystal-clear Ponzi scheme.

104. For example, on July 6, 2018, Paniagua, an Oasis compliance representative, stated to Defendants that: (a) after the last day of trading every month, Paniagua had been manually making "adjustments" and spread income deposits in investors' online accounts; and (b) instead of manually doing such, whether Defendants could "expose this capability programmatically via the web service."

105. Defendants responded and ensured this actually occurred.  For example, later in July 2018, Defendants continued to work on ensuring that the "adjustments" and spread income deposits could be automated, or made "programmatically," in investors' online accounts via the ATC web service.  On July 13, 2018, Manoukian incredibly stated to Spotex:

> They [Oasis] are able to see the spread from the IB account from the API and they are able to move it to the client account as a deposit. (currently doing it manually)
>
> But the Adjustment section they are unable to see it from the API.

The goal is to be able to do the adjustment into the client account automatically via FIX or via an upload.

106.   On July 16, 2018, Spotex responded to Manoukian:

There is a report available in our web service called Margin Upload Request. Using this method, the adjustments can be uploaded for required accounts into our back-office.

This Report is available only with master login.

107.   Therefore, during this time, Defendants confirmed that they knew the adjustments were invisible from the API (Application Programming Interface), the software that permits the transfer of data from the back-end/back-office to the end-user/investor. In other words, Defendants confirmed that they knew that investors could not see the adjustments through the website investors used to view their accounts.

108.   Defendants ultimately confirmed and ensured that moving forward for the Oasis Pools, the adjustments could and would be done automatically via the back-office that was invisible to investors. As stated above, this "adjustment" procedure was used to adjust, and eliminate, trading losses viewable to investors and thus conceal the massive trading losses from investors.

109.   The above is crystal-clear evidence that Defendants knew about, assisted, participated, supervised, enabled, and ensured the successful completion of automating the back-end/back-office "adjustments" to conceal

36

the trading losses from investors and populate false/fictitious profits to them.

110.   At or near the time that Defendants were doing this in mid-2018, the CFTC Defendants had been and were continuing to transfer to ATC millions of dollars of monies derived from Oasis investors, meaning more and more commissions or fees for Defendants.  For example, in January 2018, the CFTC Defendants transferred $3,000,000 to ATC; in February 2018, $500,000; in March 2018, another $3,000,000; in April 2018, $1,750,000; in May 2018, $100,000; in June 2018, $550,000; in July 2018, $1,000,000; and thereafter, another $3,000,000 until the CFTC sued and shut down the Oasis Ponzi scheme in April 2019.

111.   In addition, at the same time in July 2018 that Defendants were ensuring that the CFTC Defendants could automate the monthly adjustments that hid online trading losses and populated fictitious trading profits for the investors' viewing, Manoukian wanted Oasis (*i.e.*, Anile and DaCorta) to consider investing in Spotex.  This should not come as a surprise, because Manoukian also owned Spotex, in part with others, and Oasis was one of ATC's and Spotex's biggest clients, if not their biggest, from the $20-plus million transferred to ATC in the scheme.

112.   Based on the above, the Oasis, ATC, and Spotex businesses were symbiotic, and as the avalanche of investor funds began pouring in around 2017 and 2018, Oasis could not operate without the above-described

participation and assistance from Defendants.

113.   As such, Defendants knew, were generally aware, were reckless in not knowing, or, alternatively, should have known that a Ponzi scheme was occurring on their own watch through the ATC accounts.   Simply put, Defendants could have prevented this fraud.

## COUNT I
## AIDING AND ABETTING FRAUD (ALL DEFENDANTS)

114.   The Receiver realleges and reincorporates paragraphs 1 through 113 above as if fully set forth herein.

115.   The CFTC Defendants committed fraud by commingling the Oasis Entities' funds, misappropriating such funds, misusing such funds, diverting such funds from the entities, losing all funds traded in forex trading, failing to generate any trading profits to return to investors, failing to transfer any funds back to the Oasis Entities, and creating false investor account records that hid massive trading losses and populated false profits.

116.   Defendants had actual knowledge of the loss of all funds traded in forex trading, the failure to generate any trading profits to return to investors, the failure to transfer any funds back to the Oasis Entities, and the creation of false investor account records that hid massive trading losses and populated false profits, and Defendants substantially assisted or participated in such fraud.

117.   Defendants had the obligation – yet failed – to disclose the above wrongdoing, let alone anything, to anyone such as the Oasis Entities, regulators (such as the CFTC and SEC), law enforcement, innocent stockholders, and/or the innocent investors.

118.   As a direct and proximate result of the above, the Oasis Entities suffered damages.

119.   The specific misconduct that gives rise to this claim for aiding and abetting common law fraud was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the Oasis Pools, and, therefore, an award of punitive damages is appropriate.

WHEREFORE, the Receiver demands this Court to enter judgment against Defendants (a) awarding damages in an amount to be determined at trial, including pre-judgment interest; and (b) entering such other and additional relief as the Court deems just and proper.

## COUNT II
## AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES (ALL DEFENDANTS)

120.   The Receiver realleges and reincorporates paragraphs 1 through 119 above as if fully set forth herein.

121.   As the principals and advisors behind the Oasis Entities, the CFTC Defendants had special duties to administer the Oasis Entities in

accordance with the purpose of the Oasis fund and investors' investments, in the interests of the fund, and ultimately for the benefit of the innocent investors.

122.   The Oasis Entities reposed trust and confidence in the CFTC Defendants, and the CFTC Defendants had domination and influence over the Oasis Entities.

123.   The CFTC Defendants also had superior knowledge of, and access to, the activities of the Oasis Entities.

124.   As such, the CFTC Defendants owed fiduciary duties to the Oasis Entities.

125. The CFTC Defendants breached their fiduciary duties by commingling the Oasis Entities' funds, misappropriating such funds, misusing such funds, diverting such funds from the entities, losing all funds traded in forex trading, failing to generate any trading profits to return to investors, failing to transfer any funds back to the Oasis Entities, and creating false investor account records.

126.   Defendants had actual knowledge of the loss of all funds traded in forex trading, the failure to generate any trading profits to return to investors, the failure to transfer any funds back to the Oasis Entities, and the creation of false investor account records that hid massive trading losses and populated false profits, and substantially assisted or participated in such breaches of

fiduciary duties.

127.   Defendants had the obligation – yet failed – to disclose the above wrongdoing, let alone anything, to anyone such as the Oasis Entities, regulators (such as the CFTC and SEC), law enforcement, innocent stockholders, and/or the innocent investors.

128.   As a direct and proximate result of the above, the Oasis Entities suffered damages.

129.   The specific misconduct that gives rise to this claim for aiding and abetting breaches of fiduciary duties was intentional, malicious, deliberate, outrageous and reprehensible, and/or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the Oasis Pools, and, therefore, an award of punitive damages is appropriate.

WHEREFORE, the Receiver demands this Court to enter judgment against Defendants (a) awarding damages in an amount to be determined at trial, including pre-judgment interest; and (b) entering such other and additional relief as the Court deems just and proper.

## COUNT III
## FRAUDULENT TRANSFERS PURSUANT TO FLA. STAT. § 726.105(1)(a)
## (ATC ONLY)

130.   The Receiver realleges and reincorporates paragraphs 1 through 129 above as if fully set forth herein.

131.   ATC received transfers in accounts it operated and controlled (*i.e.*, the ATC Accounts) in furtherance of the subject Ponzi scheme.  The transfers that ATC received are listed in Exhibit A.

132.   ATC received the transfers with an intent to hinder, delay, or defraud OIG and the Oasis Pools.

133.   Given ATC's role in assisting and actually receiving the transfers with the scheme to defraud, ATC was not acting in good faith at the time that it received such transfers.  In fact, each transfer accepted by ATC served only to further the scheme against OIG and the Oasis Pools, and created more indebtedness for them.

134.   As a direct and proximate result of the above, OIG and the Oasis Pools suffered damages.

WHEREFORE, the Receiver demands this Court to enter judgment against ATC (a) declaring all transfers to ATC as fraudulent transfers under Florida Statue § 726.105(1)(a), avoiding same to the extent permitted by law; and (b) entering such other and additional relief as the Court deems just and proper, including pre-judgment interest.

## COUNT IV
## FRAUDULENT TRANSFERS PURSUANT TO FLA. STAT. § 726.105(1)(b)
## (ATC ONLY)

135.   The Receiver realleges and reincorporates paragraphs 1 through

134 above as if fully set forth herein.

136. ATC received transfers from accounts it operated and controlled (*i.e.*, the ATC Accounts) in furtherance of the subject Ponzi scheme. The transfers that ATC received are listed in Exhibit A.

137. ATC did not provide reasonably equivalent value to OIG and the Oasis Pools in exchange for such transfers. Each transfer accepted by ATC served only to further the scheme against OIG and the Oasis Pools, and created more indebtedness for them.

138. When receiving such transfers, ATC was engaged or about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction, and/or intended to incur, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

139. Given ATC's role in assisting and actually receiving the transfers with the scheme to defraud, ATC was not acting in good faith at the time that it received such transfers. In fact, each transfer accepted by ATC served only to further the scheme against OIG and the Oasis Pools, and created more indebtedness for them.

140. As a direct and proximate result of the above, OIG and the Oasis Pools suffered damages.

WHEREFORE, the Receiver demands this Court to enter judgment

43

against ATC (a) declaring all transfers to ATC as fraudulent transfers under Florida Statue § 726.105(1)(b), avoiding same to the extent permitted by law; and (b) entering such other and additional relief as the Court deems just and proper, including pre-judgment interest.

## COUNT V
## FRAUDULENT TRANSFERS PURSUANT TO FLA. STAT. § 726.106(1) (ATC ONLY)

141. The Receiver realleges and reincorporates paragraphs 1 through 140 above as if fully set forth herein.

142. ATC received transfers from accounts it operated and controlled (*i.e.*, the ATC Accounts) in furtherance of the subject Ponzi scheme.  The transfers that ATC received are listed in Exhibit A.

143. ATC did not provide reasonably equivalent value to OIG and the Oasis Pools in exchange for such transfers.  Each transfer accepted by ATC served only to further the scheme against OIG and the Oasis Pools, and created more indebtedness for them.

144. At the time of receiving such transfers, OIG and the Oasis Pools were insolvent or became insolvent as a result of the transfers because of the underlying Ponzi scheme discussed above.

145. Given ATC's role in assisting and actually receiving the transfers with the scheme to defraud, ATC was not acting in good faith at the time that it received such transfers.  In fact, each transfer accepted by ATC served only

44

to further the scheme against OIG and the Oasis Pools, and created more indebtedness for them.

146.   As a direct and proximate result of the above, OIG and the Oasis Pools suffered damages.

WHEREFORE, the Receiver demands this Court to enter judgment against ATC (a) declaring all transfers to ATC as fraudulent transfers under Florida Statue § 726.106(1), avoiding same to the extent permitted by law; and (b) entering such other and additional relief as the Court deems just and proper, including pre-judgment interest.

**COUNT VI**
**<u>GROSS NEGLIGENCE</u>**
**<u>(ALL DEFENDANTS)</u>**

147.   The Receiver realleges and reincorporates paragraphs 1 through 146 above as if fully set forth herein.

148.   As a forex exchange and as a provider of FX ECN-based technology, ATC/Manoukian and Spotex, respectively, had duties of care to administer the ATC accounts for the Oasis Pools in accordance with, as opposed to in violation of, minimum industry standards for forex exchanges and providers of FX ECN-based technology, respectively.

149.   Defendants breached such duties to the Oasis Pools through conscious and voluntary acts and/or inactions which were likely to result, and did indeed result, in grave damages to the Oasis Pools when in the face of a

clear and present danger of which Defendants were aware.

150.   From the above composite of circumstances, the likelihood of losses to the Oasis Pools was known by Defendants to be imminent, which collectively constituted a clear and present danger to the loss of such funds.

151.   Defendants' actions and/or inactions were gross, flagrant, recklessly indifferent, conscious, voluntary, and likely to result in losses to the Oasis Pools and ultimately the investors.

152.   Defendants' actions and/or inactions were wanting of care and exhibited a conscious indifference and careless disregard of any and all consequences, including massive losses to the Oasis Pools and ultimately the innocent investors.

153.   As a direct and proximate result of the above, the Oasis Pools suffered damages.

WHEREFORE, the Receiver demands this Court to enter judgment against Defendants (a) awarding damages in an amount to be determined at trial, including pre-judgment interest; and (b) entering such other and additional relief as the court deems just and proper.

## COUNT VII
## SIMPLE NEGLIGENCE
## (ALL DEFENDANTS)

154.   The Receiver realleges and reincorporates paragraphs 1 through 153 above as if fully set forth herein.

155.   This claim is pled in the alternative to the above claims.

156.   As a forex exchange and as a provider of FX ECN-based technology, ATC/Manoukian and Spotex, respectively, had duties of care to administer the ATC accounts for the Oasis Pools in accordance with, as opposed to in violation of, minimum industry standards for forex exchanges and providers of FX ECN-based technology, respectively.

157.   Defendants breached such duties and violated minimum industry standards.

158.   For example, Defendants never inquired into DaCorta, the head trader.  As stated above, in 2010, DaCorta had been permanently banned from soliciting and trading forex for investors.

159.   An actual background check of DaCorta would have revealed a history of failed trading activities and that he was prohibited from being registered to trade commodities or forex.

160.   In addition, Defendants knew or should have known that the Oasis Entities should have been – but were not – registered with the CFTC.

161.   As a direct and proximate result, the Oasis Pools suffered damages.

WHEREFORE, the Receiver demands this Court to enter judgment against Defendants (a) awarding damages in an amount to be determined at trial, including pre-judgment interest; and (b) entering such other and

additional relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Receiver requests a jury trial for any and all Counts for which a trial by jury is permitted.

Dated: May 28, 2021                     Respectfully submitted,

**SALLAH ASTARITA & COX, LLC**
*Counsel for the Receiver*
3010 North Military Trail, Suite 210
Boca Raton, FL 33431
Tel.: (561) 989-9080
Fax: (561) 989-9020

/s/Joshua A. Katz
**James D. Sallah, Esq.**
Fla. Bar No. 0092584
Email: jds@sallahlaw.com
**Patrick J. Rengstl, P.A.**
Fla. Bar No. 0581631
Email: pjr@sallahlaw.com
**Joshua A. Katz, Esq.**
Fla. Bar No. 0848301
Email: jak@sallahlaw.com