UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BURTON W. WIAND,

      Plaintiff,

v.                                                                  Case No: 8:21-cv-1317-MSS-AAS

ATC BROKERS LTD., DAVID
MANOUKIAN and SPOTEX LLC,

      Defendants.

_____

ORDER

      **THIS CAUSE** comes before the Court for consideration of Defendant Spotex LLC's Motion to Dismiss Amended Complaint with Prejudice (Dkt. 41), Plaintiff's response in opposition thereto, (Dkt. 50), Defendant David Manoukian's Motion to Dismiss Plaintiff's Amended Complaint, (Dkt. 42), Plaintiff's response in opposition thereto, (Dkt. 51), Defendant ATC Brokers Ltd.'s Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction, (Dkt. 43), Plaintiff's response in opposition thereto, (Dkt. 55), and Defendant ATC Brokers Ltd.'s reply in support. (Dkt. 58) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS** the Defendants' respective motions as stated herein.

I.      **BACKGROUND**

      This ancillary receivership action is brought pursuant to 15 U.S.C. § 78aa, 28 U.S.C. § 754 and 28 U.S.C. § 1367, and arises predominantly from a separate action

titled <u>Commodity Futures Trading Commission v. Oasis International Group,</u> <u>Limited, et al.</u>, No. 8:19-cv-00886-VMC-SPF (Apr. 15, 2019 M.D. Fla.) (hereinafter, the "CFTC Action"). Given the number of parties involved in both cases and the complexity of the Parties' alleged relationships with each other and other third parties, the Court provides the following background, assuming, as it must at this stage of the proceedings that the allegations contained in the Amended Complaint are true.

### a. Procedural Background

There are three underlying cases, one civil and two criminal, which lay the foundation for the instant action.[1] The first and predominant case is the civil case was the CFTC Action that was filed on April 15, 2019. Therein, the Commodity Futures Trading Commission ("CFTC") asserted five causes of actions against Defendants Oasis International Group, Limited ("OIG"), Oasis Management, LLC ("OM"), Satellite Holdings Company ("Satellite Holdings"),[2] Michael J. DaCorta, Joseph S. Anile, Raymond P. Montie, III, Francisco L. Duran, and Joseph J. Haas (hereinafter, the "CFTC Action Defendants").[3] (Dkt. 36 at ¶ 1) CFTC specifically alleged that the

---

[1] The Eleventh Circuit permits a district court to take judicial notice of certain documents attached to a motion to dismiss or response without converting the motion to dismiss into a motion for summary judgment

[2] Plaintiff alleges that Oasis International Group, Limited ("OIG"), Oasis Management, LLC ("OM"), and Satellite Holdings Company function collectively as one entity, "OASIS."

[3] CFTC alleged the CFTC Action Defendants: (i) engaged in Forex fraud by misrepresentations, omissions, false statements, and misappropriation, in violation of 7 U.S.C. § 6b(a)(2)(A)-(C) (2012) and 17 C.F.R. § 5.2(b) (Count One); (ii) engaged in Fraud and Deceit by CPOs and APs of CPOs, in violation of 7 U.S.C. § 6*o*(1)(A)-(B) (Count Two); failed to register as a CPO and Retail Forex CPO and AP of a CPO and AP of Retail Forex CPO, in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1) (2012) and 17 C.F.R. § 5.3(a)(2) (Count Three); (iv) failed to receive pool funds in the pools' names and commingling funds, in violation of 17 C.F.R. § 4.20(b)-(c) (2018) (Count Four); and (v) failed to provide pool disclosures, in violation of 17 C.F.R. § 4.21 (Count Five). See <u>Commodity</u> <u>Futures Trading Comm'n v. Oasis Int'l Grp., Ltd., et al.</u>, No. 8:19-cv-00886-VMC-SPF, ECF No. 110

CFTC Action Defendants operated OIG, OM, Satellite Holdings, Oasis Global FX, Limited ("OGNZ"), and Oasis Global FX, S.A. ("OGBelize") (collectively, the "OASIS Entities") as a Ponzi scheme.[4] (Id. at ¶ 2) The remaining two cases are the federal criminal cases against CFTC Action Defendant Joseph S. Anile, see United States v. Anile, No. 8:19-cr-334-MSS-CPT (Aug. 9, 2019 M.D. Fla.), and CFTC Action Defendant Michael J. DaCorta, see United States v. DaCorta, No. 8:19-cr-605-WFJ-CPT (Dec. 17, 2019 M.D. Fla.). (Id. at ¶ 3-7)

### 1.    The Parties

In the CFTC Action, the CFTC Action Defendants DaCorta, Anile, Montie, Duran, and Haas operated domestic and foreign entities to facilitate a Ponzi scheme. OIG, a limited corporation formed in the Cayman Islands, operated as a commodity pool operator ("CPO") by soliciting, receiving, and accepting funds from pool participants for investments in the OASIS Pools. (Id. at ¶ 14) CFTC Action Defendants DaCorta, Anile, and Montie owned and directed OIG. (Id.) OM, a limited liability corporation formed in Wyoming, also operated as a CPO. (Id. at ¶ 15) Satellite Holdings, a corporation formed in South Dakota, also operated as a CPO. (Id. at ¶ 16) CFTC Action Defendant Haas was the director of Satellite Holdings. (Id.) OGNZ, a corporation formed in New Zealand, was registered as a financial services provider until June 29, 2015. (Id. at ¶ 17) OGBelize, a corporation formed in Belize, was registered as a financial services provider in Belize. (Id. at ¶ 18)

_____

(Apr. 15, 2019 M.D. Fla.).
[4] OGNZ and OGBelize are collectively referred to as the "OASIS Pools."

In the present action, Plaintiff alleges that three additional parties participated in the same Ponzi scheme described in the CFTC Action. (Dkt. 36) Plaintiff names ATC Brokers Ltd. ("ATC"), a corporation formed under the laws of England and Wales, as a Defendant in this matter because ATC operated as "a forex firm" to open accounts and provide liquidity for accountholders to trade on leverage. (Id. at ¶ 74) Plaintiff specifically alleges that ATC opened accounts for the OASIS Entities and provided the CFTC Action Defendants liquidity to trade on leverage. (Id.) Plaintiff also names David Manoukian ("Manoukian"), a California resident, as a Defendant in this matter because Manoukian is an owner of Spotex LLC and was controlling principal and executive of ATC.[5] (Id. at ¶ 24) Plaintiff specifically alleges that Manoukian "personally managed almost all aspects of the ATC-Oasis Entities' relationships from the outset through the commencement of the CFTC Action and did so from his office or home in California." (Id. at ¶ 26) Lastly, Plaintiff names Spotex LLC ("Spotex"), a limited liability company formed under the laws of Delaware, as a Defendant in this matter because Spotex "provided a 'white label' software suite" to purchasers, who wanted to "generate online account records with various back-office tasks." (Id. at ¶ 106) Plaintiff specifically alleges that Spotex "provided the technology for these services to ATC's clients, such as Anile, DaCorta and other Oasis representatives." (Id.)

## 2.    The Ponzi Scheme

---

[5] The Court finds that it is unnecessary to address Plaintiff's reference to Jack Manoukian, Defendant David Manoukian's brother, because Plaintiff chose not to name Jack Manoukian as a party.

From late 2013 to April 2019, the CFTC Action Defendants are alleged to have "fraudulently solicited more than 700 investors, the majority of whom were U.S. residents, to invest more than $78 million in OIG, OM, and Satellite Holdings. (Id. at ¶ 50) The CFTC Action Defendants are alleged to have caused OIG, OM, and Satellite Holdings to share the same office and employees, commingle their finds, and operate under the same trade name – "OASIS". (Id. at ¶ 51) Together, the OASIS Entities shared one website to attract potential investors, and the website advertised that Oasis "provides an array of asset management and advisory services, including , corporate finance and investment banking . . . investment sales/trading and clearing services . . . financial product development, and alternative investment products." (Id. at ¶ 52)

CFTC Action Defendants used the OASIS website to attract potential investors. (Id. at ¶ 105) To gain support from potential investors, the CFTC Action Defendants used the OASIS website to show (i) fictitious returns from investment income available via online account records, and (ii) an illusion of continuous investment earnings via a web portal for investors. (Id. at ¶ 107-110) Defendant Spotex's white label software suite technology allowed the CFTC Action Defendants to generate online account records and the web portal for investors. (Id.) The web portal for investors did not allow investors to see "necessary adjustments on the back-end . . . [which] allow[ed] the CFTC Defendants to carry out the ruse of false investor account records." (Id. at ¶ 120) (internal quotations omitted). The adjustments "masked, altered, covered-up, disguised, and concealed the trading losses from investors and populated fictitious or false profits to investors." An OASIS compliance representative, Paniagua, confirmed

this practice by stating "after the last day of trading every month, Paniagua had been making manual adjustments and spread income deposits in investors' online accounts." Spotex's services "purportedly [] reward[ed] the buy-side by sending trades to the destinations with the highest execution quality." (Id. at ¶ 118) (internal quotations omitted).

Before any trading could occur, however, the CFTC Action Defendants needed a forex firm to open forex accounts for, and provide liquidity to, the CFTC Action Defendants. (Id. at ¶ 74) Defendant ATC was contracted as the forex firm for the CFTC Action Defendants. (Id.) The CFTC Action Defendants applied for and subsequently opened one forex account with ATC for OGNZ and another for OGBelize. (Id. at ¶ 93) CFTC Action Defendants Anile and DaCorta were the only signatories on these accounts. (Id. at ¶ ¶ 99 and 103) The investments solicited consisted of several forms of securities, such as: common shares, non-voting OIG preferred shares, and other OIG investments. (Id. at ¶ 53-57)

The investors contributed to, what they thought were "two subject Oasis forex commodity pools[,] – Oasis Pools 1 and 2." (Id.) Oasis Pool 1 "was opened in or around mid-2015 and received $1.3 million of investor-derived funds through December 2016." (Id. at ¶ 97) Oasis Pool 2 or the ATC account in the name of Oasis Global FX, S.A. ("OGBelize") "received $20,625,000 of investor-derived funds from January 2017 through April 2019." (Id. at ¶ 101) The pooled investments were supposed to be used to "trade forex contracts using leverage from a liquidity provider, which turned out to be ATC." (Id. at ¶ 58) To the Contrary, the CFTC Action

Defendants used the OASIS Entities as a front. In reality, the foreign entities comprising the OASIS Pools (OGNZ and OGBelize) were used to pool investor funds to trade forex contracts on a "margined or leveraged basis that did not result in timely delivery between buyer and seller." (Id. at ¶ 70)

The forex trades were leveraged 100:1, which allowed trades to "be done at 100 times the amount of cash in the Oasis Pools' trading accounts." (Id.) This practice allowed "CFTC Defendants [to] misappropriate[] (a) more than $28 million to make fictitious redemption or return payments to investors in furtherance of the Ponzi scheme and (b) more than $10 million to pay themselves, their insiders, their employees or agents." (Id. at ¶ 71) Plaintiff further alleges that "without the Defendants' substantial assistance, the CFTC Defendants could not have perpetrated their Ponzi scheme." (Id. at ¶ 72)

### b. Procedural Posture

On April 15, 2019, Judge Covington appointed Burton W. Wiand, as the Receiver for the Receivership Entities in the CFTC Action. (Id. at ¶ 8) Judge Covington directed the Receiver *inter alia* to:

> Take exclusive custody, control, and possession of the Receivership Estate, which includes but is not limited to complete authority to sue for, collect, receive, and take possession of all goods, chattels, rights, credits, money, effects, land, leases, books, records, works papers, and records of accounts, including electronically-stored information, contracts, financial records, funds. . . of the Receivership Defendants and pool participants or clients of any of the Receivership Defendants' business activities whose interests are now held by, or under the direction . . . of the Receivership Defendants . . .

> Collect all funds owed to the Receivership Defendants . . .
>
> Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to, any actions or proceedings in state, federal, or foreign court that the Temporary Receiver deems necessary and advisable to preserve or increase the value of the Receivership Estate or that the Temporary Receiver deems necessary and advisable to carry out the Temporary Receiver's mandate under this Order.

(Id. at ¶¶ 9-11)[6]

Plaintiff, who served as the Receiver in the CFTC Action, filed a Complaint against the Defendants pursuant to the "Consolidated Order to recover (i) damages caused by the Defendants' acts or omissions" and participation in the $78 million foreign exchange ("Forex") Ponzi scheme outlined in the CFTC Action; and (ii) "funds that CFTC [Action] Defendants, the Ponzi scheme operators, caused the Oasis Entities to transfer to ATC." (Dkt. 1 at ¶ 12) Defendants Spotex, ATC, and Manoukian filed their own motions to dismiss Plaintiff's Complaint. (Dkts. 24, 25, and 32)

Subsequently, Plaintiff filed an Amended Complaint, which rendered the Defendants' motions to dismiss moot. (Dkt. 36) Plaintiff's Amended Complaint asserts seven counts: (i) aiding and abetting fraud (Count I); aiding and abetting breaches of fiduciary duties (Count II); fraudulent transfer, in violation of Florida Statute § 726.105(1)(a) (Count III); fraudulent transfer, in violation of Florida Statute

---

6 See also Commodity Futures Trading Comm'n v. Oasis Int'l Grp., Ltd., et al., No. 8:19-cv-00886-VMC-SPF, E.C.F. Nos. 7 and 177 (Apr. 15, 2019 M.D. Fla.).

§ 726.105(1)(b) (Count IV); fraudulent transfer, in violation of Florida Statute § 726.106(1) (Count V); gross negligence (Count VI); and simple negligence (Count VII).

Thereafter, the Defendants each filed another motion to dismiss Plaintiff's Amended Complaint. (Dkts. 41, 42, and 43)

## II.   LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must meet an exceedingly low threshold of sufficiency. Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al., 711 F.2d 989, 995 (11th Cir. 1983). A plaintiff must plead only enough facts to state a claim to relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 560-64 (2007) (abrogating the "no set of facts" standard for evaluating a motion to dismiss established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Although a complaint challenged by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff is still obligated to provide the "grounds" for his entitlement to relief, and "a formulaic recitation of the elements of a cause of action will not do." Berry v. Budget Rent A Car Sys., Inc., 497 F. Supp. 2d 1361, 1364 (S.D. Fla. 2007) (quoting Twombly, 550 U.S. at 545). In light of a motion to dismiss, to evaluate the sufficiency of a complaint a court must accept the well pleaded facts as true and construed in the light most favorable to the plaintiff. Quality Foods, 711 F.2d at 994- 95. However, the court should not assume that the plaintiff can prove facts that were not alleged. Id. Thus, dismissal is warranted if, assuming the

truth of the factual allegations of the plaintiff's complaint, there is a dispositive legal issue that precludes relief. Neitzke v. Williams, 490 U.S. 319, 326 (1989).

## III.   DISCUSSION

Plaintiff's Amended Complaint alleges that Defendants Spotex, ATC, and Manoukian had knowledge of a Ponzi scheme and provided "substantial assistance" to the CFTC Action Defendants to carry out that Ponzi scheme. (Dkt. 36 at ¶ ¶ 72, 105, 127, 129, 131) The Court address each Defendant's motion to dismiss in turn.

### A. Spotex's Motion to Dismiss

Spotex moves to dismiss the Plaintiff's Amended Complaint for four reasons. (Dkt. 41) First, Spotex argues Plaintiff lacks standing to bring his aiding and abetting claims because the Amended Complaint fails to allege the existence of at least one innocent officer, director, or shareholder as articulated in Isaiah v. JPMorgan Chase Bank, N.A., 960 F.3d 1296 (11th Cir 2020).[7] (Id. at 10) Second, Spotex argues that Plaintiff fails to state a claim for relief on his aiding and abetting claims because Plaintiff's allegations are mere speculation, contradictory, and conclusory in relation to elements of the causes of action. (Id. at 11-16) Third, Spotex argues Plaintiff failed to state a claim for negligence because Spotex: (i) owed no duty to the OASIS Entities, and (ii) is a separate legal entity that, absent an agency relationship with a shareholder, will not be responsible for the actions of that shareholder. (Id. at 16-19) Finally, Spotex argues the Communication Decency Act ("CDA") immunizes it from liability because

---

[7] The Court acknowledges that all three Defendants raise this argument in their motions to dismiss.

Spotex is a passive interactive computer service. (Id. at 19-24) Spotex further explains that it "was not responsible for the creation or development of content, Spotex simply provided a neutral software tool that would support ATC's clients and generate various back-office tasks through." (Id. at 24)

Plaintiff's response in opposition to Spotex's motion to dismiss raises four arguments against dismissal of the Amended Complaint. (Dkt. 50) First, Plaintiff argues the Amended Complaint should not be dismissed because Plaintiff's allegations are sufficient to establish standing under Isaiah and Freeman v. Dean Witter Reynolds, Inc., 865 So. 2d 543 (Fla. 2d DCA 2003). (Dkt. 50 at 5-7) Plaintiff specifically argues that Spotex has misinterpreted Isaiah in asserting that Plaintiff failed to satisfy its initial burden of pleading the existence of an innocent shareholder. (Id. at 5-6) Second, Plaintiff argues the Amended Complaint should not be dismissed because the allegations "sufficiently plead Spotex's actual knowledge of the underlying fraud or breach of fiduciary duty and the substantial assistance Spotex provided to the CFTC [Action] Defendants." (Id. at 7) Plaintiff specifically argues that the following allegations, viewed together, raise a strong inference that Spotex actual knew of the underlying fraud or breach of fiduciary duty:

> 41. Spotex created the software that DaCorta used to conduct the doomed forex trading and was the primary conduit for third-party liquidity providers, meaning Spotex provided the electronic trading platform and access to liquidity that was necessary to carry out the Ponzi scheme. Spotex maintained back-office services for the accounts for OIG and the Oasis Pools through www.spotex.com, as further discussed below.

76. Spotex, through its affiliation with ATC and its referral relationship with ATC regarding their clients, was a firm that provided the technology for these services to clients such as Anile, DaCorta and other Oasis representatives. Given the derivative nature of Spotex's relationship with ATC, ATC's clients were also Spotex's clients. The various emails exchanged between ATC, Manoukian, Spotex and personnel from the Oasis Entities, described herein, among other things, demonstrate that ATC, Manoukian and Spotex treated Oasis, Anile, DaCorta and other Oasis representatives as their clients.

102. The OGBelize account at ATC was, again, essentially a financial black hole. Even though millions of dollars of third-party funds poured into ATC, no disbursements, transfers, or returns were ever made to the Oasis Entities from this account – or to anyone other than to ATC for its commissions and fees. Nevertheless, ATC never questioned anyone at OIG as to why no funds had been disbursed or withdrawn, other than for ATC's (and Spotex's shared) commissions.

107. ATC and Spotex provided the following: (a) technological and operational support services to the CFTC Defendants relating to the accounts, including with server space, software, and access to ATC's trading platform, including the MT4 trading platform; (b) providing the CFTC Defendants with various back-end/back-office reports that would and did manipulate via backend/back-office "adjustments" trading losses into fictitious trading profits and would publish the fictitious profits (and remove the losses) to the online portal viewable by investors

111. Among the emails between the CFTC Defendants, ATC, Manoukian and Spotex were reports showing accounts and earnings for individual investors, as shown in the screenshot below …

117. Spotex generated one representative set of reports for trading period January 2017 through February 2018 in an email string involving all Defendants. This email string expressly showed many different subaccounts for investors, along with investor names, the trading losses for each subaccount/investor account, commissions for each and adjudgments in large amounts to ultimately fully mask, alter, cover-up, disguise, and conceal the trading losses and other items such as commissions. Thus, based

on this document, which Spotex compiled and generated from its monitoring its backoffice portal, Spotex, Manoukian and ATC knew about DaCorta's trading losses of third-party monies and large adjustments of the loss amounts.

120. Defendants ATC, Manoukian and Spotex actively assisted, participated, supervised, and ensured automating or programming the necessary "adjustments" on the back-end of the investor online portal to allow the CFTC Defendants to carry out the ruse of false investor account records. Investors could not view these "adjustments" on the back-end of the portal, but Defendants could and actually assisted, participated, supervised, and ensured the "adjustments" would be automated in an easier, quicker and more efficient manner for the benefit of the CFTC Defendants.

121. As stated above, the "adjustments" masked, altered, covered-up, disguised, and concealed the trading losses from investors and populated fictitious or false profits to investors. It was necessary to automate the adjustments from manual inputs, as the number of investors grew and the CFTC Defendants raised more money from investors and transferred more money to ATC. These specific facts were not known or approved by investors. These specific facts are also evidence of a crystal-clear Ponzi scheme.

122. For example, on July 6, 2018, Paniagua, an Oasis compliance representative, stated to Defendants that: (a) after the last day of trading every month, Paniagua had been manually making "adjustments" and spread income deposits in investors' online accounts; and (b) instead of manually doing such, whether Defendants could "expose this capability programmatically via the web service."

123. Defendants responded and ensured this actually occurred. For example, later in July 2018, Defendants continued to work on ensuring that the "adjustments" and spread income deposits could be automated, or made "programmatically," in investors' online accounts via the web service. On July 13, 2018, Manoukian incredibly stated to Spotex: They [Oasis] are able to see the spread from the IB account from the API and they are able to move it to the client account as a deposit. (currently doing it manually) But the Adjustment section they are unable to see it from the API. The goal is to be able to do the adjustment into the client account automatically via FIX or via an upload.

13

124. On July 16, 2018, Spotex responded to Manoukian: There is a report available in our web service called Margin Upload Request. Using this method, the adjustments can be uploaded for required accounts into our back-office. This Report is available only with master login.

125. Therefore, during this time, each of the Defendants confirmed that they knew the adjustments were invisible from the API (Application Programming Interface), the software that permits the transfer of data from the back-end/back-office to the end-user/investor. In other words, Defendants confirmed that they knew that investors could not see the adjustments through the website investors used to view their accounts.

(Dkt. 50 at 8-9) (citing Dkt. 36). In sum, Plaintiff contends that Spotex's knowledge of back-office adjustments, "concealment of [those] adjustments, and resulting misleading account values to the positive, is more than sufficient to prove actual knowledge of the fraud and breach of fiduciary duty." (Dkt. 50 at 10) Additionally, Plaintiff argues Spotex provided "substantial assistance by automating the process by which the CFTC [Action] Defendants could manipulate the trading results through adjustments." (Id. at 11)

Third, Plaintiff argues the Amended Complaint should not be dismissed because the allegations contained therein sufficiently plead Spotex owed a duty to the OASIS Entities consistent with Florida Supreme Court precedent.[8] (Id.) Moreover, Plaintiff argues "Spotex was the primary conduit for third-party liquidity providers,"

---

[8] Plaintiff cites to three Florida Supreme Court cases for this proposition: Clay Elec. Co-op., Inc. v. Johnson, 873 So. 2d 1182 (Fla. 2003); Union Park Mem'l Chapel v. Hutt, 670 So. 2d 64 (Fla. 1996); McCain v. Fla. Power Corp., 593 So. 2d 500, 504 (Fla. 1992).

and as a result "the Oasis Entities were customers of Spotex, even in the absence of a contract." (Id. at 12) Fourth and finally, Plaintiff argues the Amended Complaint should not be dismissed because Spotex has not demonstrated that it met any of the elements necessary to establish immunity under the CDA. (Id. at 13-24)

### 1.   Statutory Immunity

As an initial matter, the Court addresses Spotex's entitlement to CDA immunity followed by any arguments that remain thereafter. The Communication Decency Act or CDA grants immunity to providers and users of an interactive computer service. 47 U.S.C. § 230(c). Section 230(c) of the CDA specifically provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The CDA has been interpreted broadly by a majority of the federal circuits to establish "federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1321 (11th Cir. 2006) (citation omitted). Immunity under the CDA is not without limitation. Id. at 1321-1322.

To claim immunity under the CDA, a defendant must show the "(1) defendant [is] a service provider or user of an interactive computer service; (2) the cause of action treats a defendant as a publisher or speaker of information; and (3) a different information content provider provided the information." Roca Labs, Inc. v. Consumer Opinion Corp., 140 F. Supp. 3d 1311, 1319 (M.D. Fla. 2015). When evaluating claims of immunity under the CDA, courts are permitted to consider this affirmative defense

at the pleading stage if it is apparent that a determination can be made from the face of the complaint. See e-ventures Worldwide, LLC v. Google, Inc., 188 F. Supp. 3d 1265, 1273 (M.D. Fla. 2016). Here, the Court is convinced such a determination is readily apparent from the face of the Amended Complaint. Therefore, the Court examines the elements of CDA immunity below.

### a. Interactive Computer Service or Information Content Provider

Spotex contends that it is an Interactive Computer Service ("ICS") and not an Information Content Provider ("ICP") and "cannot be held liable for information originating with third-party users of the service including the Receivership Entities." (Dkt. 41 at 23) Spotex cites the following factual allegations from Plaintiff's Amended Complaint to support a finding that Spotex is an ICS, notwithstanding Plaintiff's assertion that Spotex is an ICP. (Id. at 23-24) Those allegations are:

> 113.   **Spotex [] monitored DaCorta's trading activities on the back-office and would notify DaCorta – typically by email from Spotex executive, Brian Lam – when there were margin calls, margin warnings, excessive exposure, excessive credit usage, or trading losses** . . .

> 118.   This should come as no surprise because Spotex launched in 2014 with liquidity from banks and non-bank market makers. **Spotex purportedly prides itself on its use of algorithms to monitor forex trading, including, but not limited to, fill ratios and execution speeds.** Ultimately, Spotex's services are purportedly to reward the buy-side by sending trades to the destinations with the highest execution quality.

(Dkt. 41 at 24) (citing Dkt. 36 at ¶¶ 113, 117) (emphasis added). Spotex also cites In re BitConnect Sec. Litig., No. 9:18-cv-80086, 2019 WL 9104318, at *1 (S.D. Fla. Aug.

23, 2019), for the proposition that a complaint must allege that a defendant acted as an information content provider to survive a motion to dismiss. (Id. at 20) Plaintiff's argues Spotex is not an ICS because Spotex (i) "has supplied the Court with no explanation about how it was an interactive computer service;" and (ii) "cannot prove that it provided or enabled computer access by multiple users to a computer server to fit within the definition." (Dkt. 50 at 15-16)

Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." § 230(f)(2). An "access software provider" is defined as "a provider of software (including client or server software), or enabling tools that do any one or more of the following: (A) filter, screen, allow, or disallow content; (B) pick, choose, analyze, or digest content; or (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." § 230(f)(4). However, an "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3).

When assessing the plausibility of allegations within a complaint, judges within this Circuit routinely find a defendant qualifies as an ICS if the defendant hosts users on its platform and the defendant does not otherwise generate content for users. See e.g., M.H. v. Omegle.com, LLC, No. 8:21-cv-814, 2022 WL 93575, at *4 (M.D. Fla.

Jan. 10, 2022) (finding the Omegle website is an ICS, at the pleading stage, because "Omegle's hosting capabilities for its users, coupled with its lack of material content generation, place[d] it squarely within the definition of an ICS provider."); Mezey v. Twitter, Inc., No. 1:18-cv-21069, 2018 WL 5306769, at *1 (S.D. Fla. July 19, 2018) (finding that Twitter is an ICS, at the pleading stage, because "Twitter [i]s a platform that transmits, receives, displays, organizes, and hosts content."). Traditionally, the CDA immunized social networking sites and online matching services. Herrick v. Grindr, LLC, 306 F. Supp. 3d 579, 588 (S.D.N.Y. 2018) (collecting cases), aff'd, 765 F. App'x 586 (2d Cir. 2019). However, now the CDA immunizes a wide range of online platforms including: search engines, email services, and many other platforms from civil liability. See Dowbenko v. Google Inc., 582 F. App'x 801, 805 (11th Cir. 2014) (holding that Google is immune under the CDA as an ICS); In re Zoom Video Commc'ns Inc. Priv. Litig., 525 F. Supp. 3d 1017, 1030 (N.D. Cal. 2021) (holding that Zoom, an online messaging board, is an ICS); Smith v. Trusted Universal Standards in Elec. Transactions, Inc., No. 1:09-cv-4567, 2011 WL 900096, at *8 (D.N.J. Mar. 15, 2011) (holding that Microsoft is an ICS because its EHS technology "provides enabling tools that filter and disallow content in the form of spam email messages and viruses.").

The Court, after having previously granted Plaintiff leave to amend his complaint, finds the allegations in Plaintiff's Amended Complaint clearly demonstrate Spotex is an ICS. Plaintiff alleges Spotex provided (i) "a 'white label' software suite" that enabled ATC to "generate online account records" and perform back-office tasks;

(ii) "technological and operational support services" in the form of "server space, software, and access to ATC's trading platform;" (iii) "back-end/back-office reports" that featured adjustments to trading losses eventually published to an online portal; (iv) monitoring of forex trading with a resulting notification of "margin calls, margin warnings, excessive exposure, excessive credit usage, or trading losses." (Dkt. 36 at ¶ ¶ 106-07, 113) The Court finds that Spotex's white label software suite clearly constitutes "software . . . or enabling tools" because, as its description provides, it is a software that allowed ATC to "choose, analyze, or digest" account information and later transmit or display that information in the form of account records. See § 230(f)(4); see also Zango, Inc. v. Kaspersky Lab, Inc., 568 F.3d 1169, 1175 (9th Cir. 2009) (affirming the district court's finding that Kaspersky is an ICS because it provides anti-malware software that was later used by customer via server). Therefore, the Court finds that Plaintiff's allegations support a finding that Spotex is an access software provider and in turn is an ICS, because Spotex provided a white label software that subsequently ATC, OASIS, and investors used to access Spotex's online servers. § 230(f)(4); see also Zango, Inc. v. Kaspersky Lab, Inc., 568 F.3d 1169, 1175 (9th Cir. 2009); Smith, 2011 WL 900096, at *8. Therefore, Plaintiff's allegations establish that Spotex is an ICS.

### b.  Spotex as Publisher or Speaker of Information

Plaintiff's response to Spotex's motion to dismiss also argues that Spotex cannot claim immunity under the CDA "[b]ecause the [Plaintiff's] claims [do] not derive[] from Spotex's status or conduct as a publisher or speaker. (Dkt. 50 at 16)

Importantly, the second element of CDA immunity is satisfied when "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker." <u>Barnes</u>, 570 F.3d at 1102.[9] Courts have routinely found this element is satisfied where a plaintiff seeks to hold a defendant liable for failing to regulate a third party's use of the defendant's online platform. <u>See</u> <u>id.</u> (citing <u>Green v. Am. Online</u>, 318 F.3d 465, 471 (3d Cir. 2003)).

Here, Plaintiff appears to suggest that Spotex is not entitled to CDA Immunity because Plaintiff's aiding and abetting and negligence claims do not charge Spotex with being a publisher of information. (Dkt. 50 at 17-19) Plaintiff contends that his claims seek to hold Spotex liable for "designing a flawed system which generated false account records." (<u>Id.</u> at 19) The Court finds Plaintiff's contention is circular. In fact, Plaintiff's claims are inextricably related to Spotex's role in providing software that collects, generates, and transmits content, which is protected activity under the CDA. <u>See</u> <u>e.g.</u>, <u>Herrick</u>, 306 F. Supp. 3d at 588; <u>Force v. Facebook, Inc.</u>, 934 F.3d 53, 66 (2d Cir. 2019) (explaining that arranging and distributing third-party information in an online forum is an essential component of publishing). Specifically, Plaintiff's claims aim to hold Spotex responsible for the reports generated using its software, which as a result, would punish Spotex as if Spotex were the publisher or speaker of the information contained within those reports. Therefore, this Court finds the allegations

---

[9] <u>See</u> <u>also</u> Leslie P. Machado, <u>Immunity Under S 230 of the Communications Decency Act of 1996: A Short Primer</u>, 10 J. INTERNET L. 3, 9 (2006) ("What § 230 makes clear, however, is that such liability *does not* extend to information service providers who have no role in creating this content.").

in the Amended Complaint target Spotex as the publisher or speaker of information and are sufficient to satisfy the second element of CDA Immunity. See M.H., 2022 WL 93575, at *5; Herrick, 306 F. Supp. 3d at 588; Force, 934 F.3d at 66.

### c. Is there a different Information Content Provider?

Spotex contends that it is entitled to immunity under the CDA because Plaintiff does not allege that "Spotex was not responsible for the creation or development of content." (Dkt. 41 at 24) (citing In re BitConnect Sec. Litig., 2019 WL 9104318, at *1). Plaintiff argues (i) whether or not Spotex's software is neutral is a factual determination better decided later in the proceedings; and (ii) Spotex is at least partially responsible for the development of false records because it created "software that allowed the CFTC [Action] Defendants to input large adjustments to the trading data from third-party liquidity providers, converting losing trades into fictitious, profitable trades." (Dkt. 50 at 19-21)

As to the third element of CDA immunity, a service provider is protected to the extent that "a different information content provider must have provided the complained of information." See Roca Labs, 140 F. Supp. 3d at 1323 (citation omitted). A service provider will lose immunity if it creates or develops content that plaintiff claims is unlawful. Id. at 1322. To evaluate whether or not a service provider has created or developed content, courts generally apply the material contribution test.[10] Id. Under the material contribution test, courts should look to whether the

---

[10] The Eleventh Circuit has not issued a decision that addresses the material contribution test. Doe v. MG Freesites, LTD, No. 7:21-cv-00220, 2022 WL 407147, at *15 (N.D. Ala. Feb. 9, 2022).

service provider has "tak[en] actions to display actionable content [or], on the other hand, [taken] responsibility for what makes the displayed content [itself] illegal or actionable." Gonzalez v. Google LLC, 2 F. 4th 871, 892 (9th Cir. 2021).[11]

"A website does not 'create' or 'develop' content simply by providing tools that make user-created content available and usable to others." L.H. v. Marriott Int'l, Inc., No. 1:21-cv-22894, --- F. Supp. 3d ----, 2022 WL 1619637, at *9 (S.D. Fla. May 23, 2022) (citing Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1169 (9th Cir. 2008)). Courts have concluded that the following activities do not constitute material contributions: (a) a website running an ad without first evaluating the ad's content, see Shuler v. Duke, No. 2:16-cv-0501, 2018 WL 2445685, at *10 (N.D. Ala. May 31, 2018), aff'd, 792 F. App'x 697 (11th Cir. 2019); (b) a website featuring content categories for erotic or adult services, casual encounters, or massage services while simultaneously blurring explicit images, see L.H., --- F. Supp. 3d ----, 2022 WL 1619637, at *10; and (c) a website using algorithms to recommend content to users and subsequently directing certain advertisements to those user, see Gonzalez, 2 F. 4th at 895. "Ultimately, to lose immunity, a website must have engaged in something more, having clearly and 'directly participate[d] in developing the alleged illegality." Id. (citation omitted). Direct participation in the

---

Accordingly, this Court finds the material contribution test to be persuasive as several district courts within this Circuit have applied the term in their Orders. See id; L.H., --- F. Supp. 3d ----, 2022 WL 1619637, at *9; Roca Labs, 140 F. Supp. 3d at 1322.

[11] For other iterations of the material contribution test, see FTC v. LeadClick Media, LLC, 838 F.3d 158, 176 (2d Cir. 2016); Klayman v. Zuckerberg, 753 F.3d 1354, 1358 (D.C. Cir. 2014); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 257–58 (4th Cir. 2009); FTC v. Accusearch Inc., 570 F.3d 1187, 1197–1201 (10th Cir. 2009).

development of an alleged illegality includes: (a) creating a website designed to solicit and enforce discriminatory housing preferences, see Roommates.Com, LLC, 521 F.3d at 1170; or (b) creating a website that facilitates the illegal sale of products in commerce, see Webber v. Armlist LLC, 572 F. Supp. 3d 603, 616 (E.D. Wis. 2021).

In the present case, the Amended Complaint is devoid of any allegation that Spotex materially contributed to the content contained within the reports generated by ATC or the OASIS Entities. Plaintiff does, however, allege that Spotex automated "large adjustments for the CFTC [Action] Defendants." (Dkt. 50 at 21) (citing Dkt. 36 at ¶ 122-26) Looking to the automated adjustments, Plaintiff does not allege Spotex changed, altered, or otherwise manipulated information the CFTC Action Defendants reported. Nor does Plaintiff allege Spotex individually determined what adjustment(s) needed to be made and thereafter performed the adjustment(s) for the CFTC Action Defendants. Moreover, Plaintiff does not allege Spotex conditioned either the OASIS Entities' or the CFTC Action Defendants' use of the white label software on participation in unlawful activity. See Roommates.Com, LLC, 521 F.3d at 1170.

Upon consideration of the foregoing and applying guidance from the Ninth Circuit's decision in Gonzalez, the Court finds Spotex's automation of adjustments and creation of white label software are actions taken to display content. The Court further finds that the CFTC Action Defendants acted as information content providers, as they recorded trading related information on Spotex's platform and performed adjustments to alter that information. See Gonzalez, 2 F. 4th at 895.

Therefore, Spotex is entitled to CDA Immunity on all claims raised the Amended Complaint as a matter of law.[12]

**B. Manoukian's Motion to Dismiss**

Manoukian moves to dismiss the Plaintiff's Amended Complaint for five reasons. (Dkt. 42) First, Manoukian argues Plaintiff's Amended Complaint should be dismissed because Plaintiff lacks standing under <u>Isaiah</u> and <u>Freeman</u>. (<u>Id.</u> at 11-15) Second, Manoukian argues Plaintiff's Amended Complaint should be dismissed because 28 U.S.C. § 754 cannot extend receivership jurisdiction to the Central District of California as no receivership property exists there. (<u>Id.</u> at 15-16) Third, Manoukian argues Plaintiff's Amended Complaint should be dismissed because it is devoid of any allegation that Manoukian acted tortiously in his individual capacity. (<u>Id.</u> at 17) Fourth, Manoukian argues Plaintiff's Amended Complaint should be dismissed because it is devoid of any plausible allegation that Manoukian possessed actual knowledge of the CFTC Action Defendants' Ponzi scheme or breach of fiduciary duty. (<u>Id.</u> at 18-21) Fifth and finally, Manoukian argues Plaintiff's Amended Complaint should be dismissed because Plaintiff cannot cite binding authority that imposes a duty on Manoukian to the OASIS Entities. (<u>Id.</u> at 21-25)

Plaintiff's response raises four principal arguments. (Dkt. 51) First, Plaintiff argues the allegations contained within his Amended Complaint are sufficient to

---

[12] The Court, having determined Spotex is entitled to immunity under the CDA, finds Plaintiff's negligence claims are inextricably related to Spotex's role in providing white label software and automation of back-office adjustments. Therefore, Spotex's immunity under the CDA extends to these claims as well. <u>See</u> <u>Herrick</u>, 306 F. Supp. 3d at 588; <u>Force</u>, 934 F.3d at 66.

establish standing under <u>Isaiah</u> and <u>Freeman</u> for eight distinct reasons, discussed more thoroughly below. (<u>Id.</u> at 6-12) Second, Plaintiff argues the Amended Complaint properly invokes jurisdiction under 28 U.S.C §754 because this lawsuit is a chose in action that seeks to recover personal property lost in California, which is a factual dispute that is not properly decided at the motion to dismiss stage. (<u>Id.</u> at 12-15) Third, Plaintiff argues the Amended Complaint adequately alleges Manoukian committed torts in his individual capacity and any cases relied on by Manoukian are distinguishable. (<u>Id.</u> at 15-16) Fourth, Plaintiff argues the Amended Complaint adequately alleges Manoukian's actual knowledge of the Ponzi scheme and any cases relied on by Manoukian are distinguishable. (<u>Id.</u> at 16-19) Finally, Plaintiff argues the Amended Complaint adequately alleges negligence claims against Manoukian that are not based on statutory violations, and any cases relied on by Manoukian are distinguishable. (<u>Id.</u> at 19-23)

### 1. Standing

Manoukian argues that Plaintiff lacks standing to raise any tort claims against him pursuant to <u>Isaiah</u> and <u>Freeman</u> because the Amended Complaint: (i) alleges CFTC Action Defendants Anile, DaCorta, and Montie were owners and controllers of the Ponzi-scheme entities; (ii) fails to allege the unnamed shareholders existed when the receiver was appointed; and (iii) fails to allege unnamed shareholders were innocent because they sold their shares. (Dkt. 41 at -14) Plaintiff argues in response that the Eleventh Circuit's decision in <u>Isaiah</u> requires an allegation that any pre-receivership activity be illegitimate, but Manoukian's motion claims the opposite –

that the OASIS Entities were engaged in legitimate activities. (Dkt. 51 at 6-7) Second, Plaintiff argues the allegations contained in Amended Complaint comply with Isaiah and Freeman because Plaintiff alleges the existence of honest and innocent investors, shareholders and limited partners. (Id. at 8) Plaintiff specifically argues that Freeman only requires that a complaint allege that (i) an innocent shareholder exists, and (ii) the innocent shareholder did not know of the Ponzi scheme or participate in it. (Id. at 9) Third, Plaintiff argues that this issue is factual and premature at the motion to dismiss stage. (Id. at 11-12)

In Freeman, the Second DCA explained that there are two types of claims that may arise in this context:

> First, there are actions that the corporation, which has been "cleansed" through receivership, may bring directly against the principals or the recipients of fraudulent transfers of corporate funds to recover assets rightfully belonging to the corporation and taken prior to the receivership. This was the case in *Scholes* and *Schacht*. Distinct from these claims, however, are common law tort claims against third parties to recover damages in the name or shoes of the corporation for the fraud perpetrated by the corporation's insiders. These are the types of claims barred in *Feltman*. When the entities in receivership do not include a corporation that has **at least one honest member of the board of directors or an innocent stockholder**, we do not perceive a method to separate the fraud and intentional torts of the insiders from those of the corporation itself.

Freeman, 865 So. 2d at 51 (emphasis added).

After careful consideration, the Court finds Plaintiff lacks standing under Isaiah and Freeman. The Parties appear to agree that Plaintiff must allege the existence of "at least one honest member of the board of directors or an innocent stockholder" to

have standing. See Freeman, 865 So. 2d at 550-51. The Eleventh Circuit decision in Isaiah does not hold that a receiver's recitation that "one honest member of the board of directors or an innocent stockholder" exists, is sufficient to allege standing. Isaiah, 960 F.3d at 1296-1308. In fact, the Eleventh Circuit in Isaiah only reviewed the complaint's allegations for sufficiency to determine whether or not the allegations met the standard articulated in Freeman. Id. at 1307-08.

This Court finds Freeman to be instructive as to the issue of standing. To properly establish standing under Freeman, a receiver must allege sufficient facts that plausibly suggest a receivership entity "is separate and distinct from these intentional tortfeasors." 865 So. 2d at 551 ("Thus, in order to allege a common law tort against these defendants, it is incumbent upon Mr. Freeman to establish that North American is separate and distinct from these intentional tortfeasors."). Nowhere in Plaintiff's Amended Complaint does Plaintiff allege that any OASIS Entity (OIG, OM, OGBelize, or OGNZ) was separate and distinct from the intentional tortfeasors that controlled them – CFTC Action Defendants Anile, DaCorta, and Montie. Plaintiff argues ¶ 50 and ¶ 53-59 of his Amended Complaint are sufficient to allege the existence of an innocent shareholder, which is all that is required under Isaiah and Freeman. The Court finds Plaintiff's understanding of Isaiah and Freeman to be incorrect. Merely alleging that a corporation has shareholders, limited partners, or investors is insufficient to establish standing under either Isaiah or Freeman.

The determinative factor is whether Plaintiff's Amended Complaint contains facts that make it plausible that CFTC Action Defendants Anile, DaCorta, and Montie

operated the OASIS Entities as separate and distinct entities. The Court is not convinced Plaintiff has so pleaded. In fact, Plaintiff's Amended Complaint suggests that Anile, DaCorta, and Montie operated the OASIS Entities as sham corporations. For example, Plaintiff alleges "Anile, DaCorta[,] and Montie owned and controlled OIG and served as its Board of Directors." (Dkt. 36 at ¶ 14) Plaintiff further alleges "the CFTC Defendants caused OIG, OM, and Satellite Holdings to (a) share the same office and employees; (b) commingle their funds; and (c) operate under the common "Oasis" trade name." (Id. at ¶ 51) Even more telling is Plaintiff's allegation that "The CFTC Defendants caused the Oasis Entities to operate as one common enterprise through their own interrelated entities." (Id. at ¶ 52) Plaintiff does not allege anywhere in the Amended Complaint that any innocent limited partners, shareholders, or investors had any ownership control or had further involvement in OASIS beyond purchasing shares or stock in a corporation that did not exist.

Therefore, the Court finds, as the Eleventh Circuit did in Isaiah, that Plaintiff's Amended Complaint is virtually indistinguishable from Freeman. See Isaiah, 960 F.3d at 1307; Freeman, 865 So. 2d at 550-51. The Court further finds that Plaintiff lacks standing to bring his aiding and abetting and negligence claims. Plaintiff's ability to pursue these claims is barred because the OASIS Entities were controlled exclusively by persons engaging in and benefitting from the Ponzi scheme, so the doctrine of *in*

*pari delicto* does not apply. See Freeman, 865 So. 2d at 550-51. Accordingly, Plaintiff's Amended Complaint is due to be **DISMISSED WITH PREJUDICE**.[13]

Having resolved Manoukian's first argument in his favor, the Court does not reach the Parties' remaining arguments. The Court proceeds to Defendant ATC's motion to dismiss.

### C. ATC's Motion to Dismiss

ATC moves to dismiss Plaintiff's Amended Complaint for two reasons. (Dkt. 43) First, ATC argues Plaintiff's Amended Complaint should be dismissed because 28 U.S.C. § 754 cannot extend receivership jurisdiction to the Central District of California as no receivership property exists there. (Id. at 10-12) Second, ATC argues Plaintiff's Amended Complaint should be dismissed because this Court does not have personal jurisdiction, general or specific, over it. (Id. at 12-24) Plaintiff's response counters ATC's assertions. (Dkt. 55) ATC's reply in support of its motion to dismiss principally argues that Plaintiff's Amended Complaint has not established personal jurisdiction over ATC and instead Plaintiff attempts to confuse ATC-UK with ATC-US. (Dkt. 58)

Having determined that Plaintiff lacks standing, the Court does not reach the ATC's personal jurisdiction arguments.

### IV.   CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

---

[13] See Isaiah, 960 F.3d at 1308 n.9 (citing Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002) (en banc)).

1.   Defendant Spotex LLC's Motion to Dismiss Amended Complaint with Prejudice (Dkt. 41), is **GRANTED**.

2.   Defendant David Manoukian's Motion to Dismiss Plaintiff's Amended Complaint, (Dkt. 42), is **GRANTED**.

3.   Defendant ATC Brokers Ltd.'s Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction, is **GRANTED**.

4.   Plaintiff's Amended Complaint, (Dkt. 36), is **DISMISSED WITH PREJUDICE**.

5.   The Clerk is **DIRECTED** to **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida, this 27th day of September 2022.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person

30